**Paul STANISH, Plaintiff-Appellee,**

v.

**POLISH ROMAN CATHOLIC UNION OF AMERICA, Defendant-Appellant.**

No. 72–1579.

United States Court of Appeals, Seventh Circuit.

Argued April 26, 1973.

Decided July 30, 1973.

Rehearings Denied Sept. 20, 1973.

---

4. The Beards' Basic History of the United States, p. 97 (1944).

Keith F. Bode, Chicago, Ill., for defendant-appellant.

Peter C. Bomberger, Charles G. Bomberger, Hammond, Ind., for plaintiff-appellee.

Before MOORE,* CUMMINGS and PELL, Circuit Judges.

MOORE, Circuit Judge:

### I. Background of This Case

This diversity action comes to us on appeal from a judgment of the United States District Court for the Northern District of Indiana, George N. Beamer, *Chief Judge*, which awarded plaintiff-appellee, Paul Stanish (Stanish) an Indiana resident, damages in the amount of $707,000. This action was brought to recover sums allegedly lost (by Stanish) when defendant-appellant, Polish Roman Catholic Union (PRCU), an Illinois not-for-profit fraternal benefit society, refused to honor an alleged commitment to lend plaintiff-appellee $260,000, to be used to partially finance construction of a high-rise apartment building.

Early in 1966, Stanish [1] began investigating the feasibility of building an apartment complex in Whiting, Indiana. He located an appropriate site on the shore of Lake Michigan. Stanish, his attorney, and several others then met with three members of the PRCU loan committee to discuss financing of part of the project. PRCU expressed interest in making a mortgage loan, indicated that they could lend only up to two-thirds of the appraised value of the real estate, and asked for an independent appraisal of the land for use in determining the amount PRCU could properly lend on the site.

Stanish then hired an appraiser whose appraisal stated that the land, approximately 8.341 acres, was valued at $1.00 per square foot, or $363,350 in its undeveloped condition, *i. e.*, "as is". The appraisal further stated, however, that with the "positive assurance" that an apartment complex of at least 250 units would be built on the site within two years, the land would have a value of nearly $1,000,000.[2] In addition to the commitment to build a 250-unit apartment building on the site, the $1,000,000 appraisal was conditioned on nine further points including such items as appropriate rezoning to permit the construction of an apartment building, availability of city sewage and water connections at the site, and successful conclusion of tests to establish that the soil at the site could support the proposed building.[3]

---

* Hon. Leonard P. Moore, Senior United States Circuit Judge, United States Court of Appeals for the Second Circuit, sitting by designation.

1. Originally, Ronald Foust was Stanish's partner in this real estate development project. Foust later withdrew from the project and filed a partition suit against Stanish. The suit was settled on February 8, 1967, when Stanish bought Foust's interest in the project for $15,000 cash and a note for $55,000.

2. The appraisal stated that with a 250-unit apartment building on the site, the property would have a value of $3.00 per square foot. The appraisal stated that the property, "as is", was worth $1.00 per square foot, or $363,350. The *added* value of the land with the building on it was $2.00 per square foot or $726,676. Since the appraisal was based on "positive assurance" that the building would be completed within two years, the ap-

praiser discounted the added value of $726,676 at 6% interest and 2% for taxes and arrived at a *present* value of the land with the building on it of $622,979. This figure added to the value of the land "as is" (which value was increased, without explanation in the appraisal, to $377,000) totalled $999,979, which was rounded off to $1,000,000.

3. The conditions to the appraisal in addition to the "positive assurance" that a 250-unit apartment building would be built on the site within two years were as follows:

(1) That a city water supply ample for proposed improvements would be made available by the city at the southerly or easterly lot line.

(2) That a sewage disposal line of capacity ample to serve proposed improvements would be brought to the southerly or easterly lot line at city expense.

This appraisal was submitted to the PRCU loan committee, together with a request for a mortgage loan of $650,000 at 6% interest. On August 1, 1966, PRCU approved the requested loan.

By this time Stanish had reached an agreement to purchase the land for $291,935. PRCU informed Stanish that its funds were then committed and suggested that, if he needed funds to purchase the site immediately, he could take a "letter of commitment" from PRCU stating that it would lend him the money and use that letter to obtain interim financing elsewhere. Such interim financing was arranged at the Hoosier State Bank of Indiana (Hoosier).

The Letter of Commitment, dated August 11, 1966, provided that PRCU would make a $650,000 mortgage loan to Stanish on the 8+ acre site. It further provided that the site would be divided into five parcels and that the mortgage would include a clause permitting the mortgagor to effect release of any of these parcels upon payment of $666.67 per individual apartment unit to be constructed on that parcel. The letter further stated that Hoosier planned to lend $300,000 to Stanish, secured by a mortgage on the tract, that within six months PRCU would pay out $300,000 to liquidate this loan, and that with respect to this loan from Hoosier, no cancella-

tion of the PRCU commitment to lend money to Stanish could be made. The Letter of Commitment included the statement that said Letter was irrevocable for six months.

On August 19, 1966, using the Letter of Commitment, Stanish borrowed $300,000 from Hoosier and purchased the site. Three months later Stanish requested a preliminary disbursement of $150,000 from PRCU. Stanish was informed that because of existing commitments, no disbursement could be made at that time, but that the full commitment would be honored by February 10, 1967.

On February 8, 1967, Stanish and his attorney met with officers of PRCU and executed and delivered five loan applications, each in the amount of $130,000 and each secured by a mortgage on one of the five parcels into which the building site had been divided, as provided in the Letter of Commitment. Later the same month the president of PRCU called Stanish's attorney to say that the general counsel of PRCU had reviewed the appraisal and was having second thoughts about it. On March 1, 1967, Stanish finally received a loan from PRCU of $390,000, which funds were sufficient to enable him to repay the Hoosier loan and to cover his expenses up to that point. This loan was secured by a single mortgage on the entire site,

(3) That within two years from July 1st, 1966, the various governing bodies —Federal Government, State of Indiana, Lake County and City of Whiting will have accomplished enactment and enforcement of legislation that would prohibit contamination of water in Lake Michigan that now makes the water unsafe for children's play and bathers on the Lake Beach.

(4) That a masonry fence of suitable proportion between subject land and the railroad right-of-way southwest and adjoining and along the north line would be erected as a safeguard for children that might enter the railroad right-of-way, and as a sound barrier at ground level from train movement on the multiple railroads.

(5) That zoning will be granted for the erection of multi-story apartment buildings.

(6) That the nature of the soil under subject land is such that it will support foundations for buildings of a height ordinarily supported by natural soil. (Buildings of ten or more floors may require caissons to bedrock).

(7) That title to the land includes Riparian Rights.

(8) That a feasibility study will be made by some responsible agency, and that its findings will indicate, that enough tenantry is available, able to pay the required rental and indicating an interest as to reasonably expect occupancy of buildings as are planned to be erected on subject land, that may require a rental of $50.00 or more per room.

(9) That title to the land includes Riparian Rights, and that title includes the north end of the section as it extends under water.

not by separate mortgages on the five parcels which made up the site, as the parties had originally planned. This loan also involved several other variations from the arrangement described in the Letter of Commitment.

After securing this loan, Stanish obtained a commitment from Baird & Warner, Inc., Chicago mortgage brokers, to finance the $3,600,000 cost of the apartment building. This commitment was conditioned upon the agreement of the Federal Housing Administration (FHA) to insure the mortgage. Miscellaneous expenses not covered by the construction loan were to be met out of a $300,000 line of credit from the First National Bank of Chicago. This credit was also conditioned upon FHA mortgage insurance.

Stanish was ultimately successful in securing tentative FHA approval for mortgage insurance. The FHA, however, conditioned its insurance on a scaling down of the project from 250 to 180 units and on the establishment of a $150,000 loss reserve. In November, 1967, the FHA informed Stanish that it was ready to approve his application for insurance, but that he would first have to establish the loss reserve and secure clear title to the parcel on which the building would be built. Stanish then sought to borrow the $260,000 remaining on PRCU's $650,000 loan commitment. In accordance with the terms of the Letter of Commitment, Stanish proposed to pay back to PRCU $120,000 of this additional loan so that he could secure title to one of the parcels.[4]

---

4. The Letter of Commitment read as follows:

August 11, 1966

LETTER OF COMMITMENT

TO: Senator Paul Stanish,
Mr. Ronald Kent Foust and
Hoosier State Bank of Indiana,
Hammond, Indiana

This is to certify that the Polish Roman Catholic Union of America, through appropriate action of its executive loan committee on August 1, 1966, has committed itself to make a $650,000.00 mortgage loan unto Senator Paul Stanish and Mr. Ronald Kent Foust, or their nominee, on a certain parcel of real estate together with any increments or increase to the acreage by reason of land fill permissible under the rights granted by the statutes of the State of Indiana, as well as the riparian rights of the land thereunto appertaining; said real estate being more particularly described as follows, to-wit: [detailed description of property]

Said $650,000.00 loan is to be evidenced by a Note, secured by a two year mortgage with interest at 6% per annum payable in advance every three months, together with 1% commission per year, also payable in advance, and said mortgage is to grant unto the mortgagors an option for a one year extension for final payment.

The parcel of land is to be divided into five separate parcels and survey made and submitted to the Polish Roman Catholic Union of America. The real estate mortgage is to contain a clause granting unto the mortgagors the right and privilege of prepayment to effect release of one or more parcels of land from the mortgage upon payment of 66⅔% of $1,000.00 per apartment unit in the high rise constructed on each parcel of land.

The Polish Roman Catholic Union of America has been informed that the said Senator Paul Stanish and Ronald Kent Foust have applied to the Hoosier State Bank of Indiana, Hammond, Indiana for interim financing in the sum of $300,000.-00 to be evidenced by a Promissory Note secured by a real estate mortgage on the hereinabove described land and the Polish Roman Catholic Union of America commits itself to pay out the loan commitment of $650,000.00 in instalments, the first in the sum of $300,000.00 to be paid within one hundred and twenty (120) days and the balance to be paid out within six (6) months from date; further, that said sum of $300,000.00 is to be made payable unto the said Senator Paul Stanish, Ronald Kent Foust, or their nominee, and the Hoosier State Bank of Indiana, so that their loan will be liquidated and the mortgage released.

Further, the Polish Roman Catholic Union of America agrees that as far as the Hoosier State Bank of Indiana, Hammond, Indiana is concerned, on their loan of $300,000.00, there shall be no cancellation of the $650,000.00 commitment given by the Polish Roman Catholic Union of America unto Senator Paul Stanish and Ronald Kent Foust or their nominee to the extent of $300,000.00 nor can there be a withdrawal of the commit-

PRCU refused to advance further funds to Stanish until construction had begun. Stanish responded that no construction could begin until he had title to the parcel of land on which the building was to be built and the FHA had issued its mortgage insurance. PRCU refused to lend the additional funds; Baird & Warner thereupon withdrew from the project.

Stanish's later attempts to secure financing for his project were unsuccessful. PRCU has since instituted foreclosure proceedings to secure repayment of the $390,000 loan.[5]

The district court held that defendant-appellant PRCU had breached a contract to lend plaintiff-appellee Stanish a total of $650,000 and to release the parcel upon which Stanish planned to build. The court found that Stanish could have built the apartment with the financing he had arranged and could have sold the building for $400,000 more than the mortgage. The court further found that the remaining parcels comprising the site also could have been sold for $280,000 above the mortgage they secured, and that Stanish's potential indebtedness to PRCU (on the $390,000

mortgage loan) was $27,000 more than the value of the land. Totalling these items, the district court concluded that Stanish had been damaged in the amount of $707,000 by PRCU's failure to lend the $260,000, and that PRCU was liable for these damages.

For the reasons discussed below, we reverse the decision of the court below and remand for further proceedings.

## II. The Legality of the Contract to Lend

PRCU appeals the award of $707,000 damages to Stanish because it claims the loan commitment under which he recovered was illegal under the laws of Indiana and Illinois and in violation of PRCU regulations. PRCU is an Illinois corporation licensed to do business in Indiana. Indiana law provides that, as a fraternal benefit society, PRCU may legally invest its funds in accordance with Indiana law or in accordance with the laws of the state of its incorporation.[6] An Illinois statute restricts PRCU investments in land to loans secured by first mortgages on sites which are im-

---

ment by the Polish Roman Catholic Union of America by reason of any possible borrower's concealment, misrepresentation, undue influence or change in borrower's financial condition.

Further, this Letter of Commitment is prepared and executed to induce the Hoosier State Bank of Indiana, Hammond, Indiana to make a loan of $300,000.00 unto the said Senator Paul Stanish and Ronald Kent Foust or their nominee, and that at the time of the first pay-out of $300,000.00, said sum shall be used to pay the obligation to the Hoosier State Bank of Indiana, first.

This commitment is irrevocable for a six months period from date.

Respectfully submitted
Polish Roman Catholic
Union of America
By *Joseph T. Pranica*
President

Attest:
*Vincent M. Versen*
Vincent M. Versen
Secretary General

5. Counsel informed us at oral argument on this appeal that in its foreclosure suit against Stanish, PRCU seeks more than $500,000 in damages.

6. Ind.Stats. 39–4409 (Burns 1965), IC 1971, 27–1–14–9.

Every [fraternal benefit] society shall invest its funds only in securities permitted by the laws of this state for the investment of the assets of life insurance companies and such securities shall be valued according to the methods used in valuing similar securities held by life insurance companies: Provided, That any foreign society permitted or seeking to do business in this state, which invests its funds in accordance with the laws of the state in which it is incorporated, shall be held to meet the requirements of this act for the investment of funds.

proved by permanent buildings or which produce income. The statute also limits the amount of such an investment to 75% of the fair market value of the real estate.[7] In addition, PRCU's internal rules, of which both Stanish and his attorney admitted knowledge, limited PRCU mortgages to 66⅔% of the value of the real estate.

■ The foundation of PRCU's illegality argument is that the appraiser whom Stanish hired stated that the apartment site had a present value of $363,350 "as is". PRCU attacks the appraiser's alternative $1,000,000 valuation which was conditioned on positive assurance that a 250-unit apartment building would be built on the site within two years. PRCU says that no such "hypothetical" appraisal may be used to avoid the Illinois and PRCU percentage limitations on real estate investments. In addition, at the time it was to have made the loan, PRCU notes that the site was unimproved by permanent buildings and was not producing income. PRCU states that it cannot be held for breach of a contract to lend money on a mortgage which would have violated its own regulations and been illegal under both Illinois and Indiana law. Furthermore, PRCU argues, since the nine conditions of appraisal were never met, the land never was worth its hypothetical value of $1,000,000, which "value" would have brought a loan of $650,000 within the percentage limitations of the applicable state laws and of PRCU's own regulations.[8]

For his part Stanish claims that even if the land were not worth $1,000,000 (which he does not concede), the proposed loan was not illegal since there is an Illinois statute which authorizes PRCU to make "[a]ny investments of any kind, in the complete discretion of the company * * *."[9] Stanish further argues that the contemplated loan

7. Ill.Rev.Stats., ch. 73, § 737.15a (1971).
 [A domestic insurance company may acquire]
 Obligations for the payment of money secured by first mortgages on real estate situated within any state of the United States of America upon the following conditions:

 \* \* \* \* \*

 (c) The land to which the mortgage pertains must be (i) improved with permanent buildings, (ii) used for agriculture or pasture, or (iii) improved and income-producing, including, but not limited to, parking lots and leases, * * *.

 \* \* \* \* \*

 (e) The amount of each investment secured thereby does not exceed 75% of the fair market value of the real estate and such value is established and evidenced by the written appraisal of a qualified real estate appraiser who may be an employee of the company * *.

8. PRCU also argues that the application forms submitted by Stanish contain a number of false statements regarding the length of time Stanish had owned the land and its value. The district court did not give great weight to these false statements. Stanish claimed that PRCU had told him what figures were to be filled in on the forms. It is clear that PRCU was not misled by these statements since they were familiar with the actual cost of the land to Stanish and the other facts which appear to be falsely described on the forms. In view of this knowledge we do not believe PRCU should be heard to argue that these statements, which the district court found PRCU had told Stanish to make (Finding of Fact 17), are grounds for it to avoid a contract to lend to Stanish.

9. Ill.Rev.Stats. ch. 73, § 737.22a (1971), provides as follows:
 [A domestic insurance company may acquire]
 Any investments of any kind, in the complete discretion of the company, without regard to any condition of, restriction in, or exclusion from Sections [736] to [737.22a], inclusive, and regardless of whether the same or a similar type of investment has been included in or omitted from any such Section, on the following condition:
 (a) A company shall not invest under this Section more than the lesser of (i) 5% of its admitted assets, or (ii) 50% of the amount by which its capital and surplus exceeds minimum capital and original surplus requirements applicable to the company when licensed.
 No direct evidence was received below on the question of what other loans PRCU might have had outstanding under this section.

was proper because the land was "improved" by an existing parking lot, which was "income producing property" as required by Illinois law; that all of the conditions of the $1,000,000 appraisal had been met when PRCU refused to lend the $260,000; and that, in any case, PRCU has waived any right to contest the issue of illegality by not affirmatively pleading and proving it in the proceedings below.

During the fourth and last day of the trial, PRCU offered to prove the illegality of the proposed loan under both the Illinois and Indiana statutes. After plaintiff's attorney objected to this because there had been no pleading or other contention that the loan was unauthorized or illegal, the attorney for PRCU said:

> Now, the statute may be somewhat irrelevant, but I think it bears on the general subject matter.

(Transcript at 452).

We seriously doubt whether PRCU would have agreed in its Letter of Commitment to make an "illegal" loan to Mr. Stanish, and we agree with the district court that, since this issue was not pleaded as an affirmative defense in accordance with Rule 8(c), F.R.Civ.P., and was not otherwise raised below by plaintiff's proof or by consent, the offer of such proof, which PRCU conceded might be "somewhat irrelevant" at that stage of the proceedings, was properly refused by the court below as having been waived. *See* Radio Corp. of America v. Radio Station KYFM, Inc., 424 F. 2d 14, 17 (10th Cir. 1970); 2A J. Moore, Federal Practice ¶8.27 [3].

We so hold for a number of reasons. First, the record reveals that PRCU's officers and loan committee were fully informed as to the nature of the proposed construction site and well knew its value. Second, there can be no suggestion that PRCU was misled by Stanish into agreeing to a loan which it later discovered might violate their own internal regulations, or the laws of any state. Third, as the lender, before issuing its Letter of Commitment, PRCU could have insisted on whatever mortgage conditions it felt necessary to protect its investment and could have kept the loan within whatever percentage guidelines it wished. Fourth, so far as the record shows, when PRCU refused to lend the $260,000 to Stanish, it did not suggest that it was doing so because it believed such loan to be "illegal." Finally, this action was commenced on June 10, 1970. Trial was had in January and February, 1972, and yet the illegality of the requested loan was suggested only on the final day of trial. Given the length of time between commencement of this action and the trial, during which PRCU might have sought to raise the question of illegality, thus enabling this issue to be fully prepared and tried, and given the other factors discussed above, we think that PRCU has waived the right to raise this issue on appeal.

### III. The "Contract" to Lend.

The district court found that by its Letter of Commitment defendant

> had "committed" itself to make a $650,000.00 mortgage loan to [Stanish] * * *. [This letter] contained no mention of any conditions precedent * * *. Specifically, the commitment was not made contingent upon fulfillment of any of the nine conditions set forth in the appraisal. The letter concluded with the representation that "[t]his commitment is irrevocable for a six months period from date."

(Finding of Fact 10).

The court further found that defendant's commitment was irrevocable as to plaintiff for a period of six months following the date of its execution. (Finding of Fact 12).

The basis for the court's latter finding is not clear. The court apparently believed either that PRCU was bound to its Letter of Commitment because both Hoosier State Bank and Stanish had relied on this letter (Findings of Fact 13, 14), or that PRCU's offer to lend to

Stanish was accepted by him before it was withdrawn.

■ It is clear that Stanish gave no consideration in exchange for the PRCU promise contained in its Letter of Commitment; that promise, therefore, was not "irrevocable" despite language to the contrary in the Letter.[10]

The Restatement of Contracts describes what is often called "promissory estoppel" as follows:

A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.

Restatement of Contracts § 90 (1932);

Restatement (Second) of Contracts § 90 (Tent. Draft Nos. 1–7 (1973)).

■ There can be no dispute that the elements of this definition have been met with respect to the Hoosier Bank. The Letter of Commitment was deliberately written at PRCU's suggestion to induce Hoosier to extend to Stanish the interim financing necessary for the purchase of the site, and it so stated. Hoosier's reliance on PRCU's "irrevocable" Letter of Commitment was reasonable and substantial, and was, in fact, induced by that Letter. As to Hoosier, then, the promise to lend Stanish money sufficient to cover the Hoosier loan was binding on PRCU. And this promise was honored by PRCU. As the district court found in describing the events of

February, 1967, when $390,000 was advanced to Stanish:

Initially [PRCU] was reluctant to advance any funds at all; but when plaintiff's counsel advised [PRCU] that the inevitable result would be a lawsuit by the [Hoosier] Bank, [PRCU] suggested the possibility of a partial payment, sufficient to retire the Hoosier loan and pay plaintiff's other current expenses * * *.

(Finding of Fact 18).

Stanish agreed to accept this loan and did use it to retire his Hoosier loan and to pay his expenses to that point.

■ We do not find it necessary to consider whether by borrowing $300,000 from Hoosier and by purchasing the building site Stanish sufficiently "relied" upon PRCU's Letter of Commitment so that he, like Hoosier, would come within the doctrine of promissory estoppel. Regardless of whether the Letter of Commitment was irrevocable or not, it is undisputed that the offer contained in that Letter was not withdrawn by PRCU before it was accepted by Stanish. On February 8, 1967, Stanish formally applied for the $650,000 loan offered in the Letter of Commitment, thereby accepting its continuing offer. It was a week after this acceptance that PRCU first notified Stanish there were problems with the loan because it was then thought that the "appraisal was not right". (Transcript at 48.) Thus, regardless of the revocability of the Letter of Commitment, no effort was made on behalf of PRCU to revoke that Letter and the offer contained therein before it was accepted by Stanish. It is elementary that

10. 1 Corbin on Contracts § 43 states:
 An offer can be made irrevocable in two ways, and probably only two; these are by contract and by statute. As has already been seen, an ordinary offer between private individuals is revocable by the offeror. It is irrevocable only when he has promised not to revoke it, or has promised the offered exchange of performances on condition of acceptance within a period of time, and that promise is binding by reason of a seal, a consideration given in exchange, or subsequent action in reliance upon it. Such a binding promise is itself a contract, as that term is commonly defined. In such cases, also the offeree is said to have a "binding option." (footnotes omitted).
 There are no statutes which would have made PRCU's Letter of Commitment irrevocable.

once its offer had been accepted, PRCU could not withdraw it or vary its terms.

PRCU argues, however, that the loan actually made to Stanish on March 1, 1967, varied in many significant terms from that proposed by the Letter of Commitment and thus represented, not acceptance by Stanish of that offer, but rather a "substituted contract" or "novation" which relieved PRCU of any obligation which it may have had under the Letter of Commitment. Printing Mach. Maint., Inc. v. Carton Prods Co., 15 Ill.App.2d 543, 552, 147 N.E.2d 443, 448 (1957); Better Taste Popcorn Co. v. Peters, 124 Ind.App. 319, 323–324, 114 N.E.2d 817, 819–820 (1953). The $390,000 loan did differ in several important respects from that offered in the Letter of Commitment. The principal amount of the loan was $260,000 less than that specified in the Letter; Stanish did not mortgage all of the site, but kept back 100 feet along the southern property line for "necessary purposes for the improvement of the * * * real estate;"[11] and the mortgage contained no provision under which, by partial repayment of the loan, Stanish could gain release of any of the five parcels which comprised the mortgaged site.[12]

At trial PRCU's president testified that he had told Stanish that the $390,000 was the entire amount which PRCU would lend him. Stanish testified, and the district court found that the $390,000 was simply "an immediate partial payment * * * on the understanding that the remaining $260,000.00 would be forthcoming when [Stanish] needed it." (Finding of Fact 19). The court concluded that

> [t]he agreement reached between plaintiff and defendant in the latter part of February, 1967, was simply a modification of the payment schedule contemplated by the Letter of Commitment. It was not intended as a re-

scission, novation, or satisfaction of the original commitment, and did not release defendant from its obligation to loan defendant [sic] the full $650,000.00. (Finding of Fact 21).

On the question of whether the March 1, 1967, loan was a partial payout under a modified payment schedule or a substituted contract which replaced the originally contemplated loan, we believe that the critical issue is the intention of the parties in agreeing to that loan. We have examined this issue with especial care and have determined that the district court's conclusion that there was no substituted contract is correct. In determining the intent of the parties here, the district court had an opportunity to weigh the testimony and evaluate the credibility of Stanish and his attorney in the matter and of the witnesses for PRCU. We have found nothing in the record or in the briefs on appeal which would lead us to differ with the court's finding on this issue. F.R.Civ.P. 52(a); Mandell v. Miller, 14 Ill.App.2d 430, 441, 144 N.E.2d 791, 797 (1957).

Having found that there was no substituted contract and that the obligation of PRCU to lend Stanish the money was created when, on Feburary 8, 1967, Stanish accepted the offer contained in PRCU's Letter of Commitment, we conclude that PRCU breached its agreement with Stanish when it refused to lend him the $260,000.

## IV. Damages

In determining the amount of damages which is proper for a breach of contract, a Federal Court, of course, must determine and follow the law which the state of the forum would apply to the case. Erie R. R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

With respect to the question of remedies for breach of contract, Indi-

---

11. PRCU claims that this 100 foot section amounted to 45% of the entire site and effectively blocked access to the remaining 55%.

12. See the formula described in the third paragraph of the Letter of Commitment, *supra* note 4.

ana courts would apply Indiana law. Paulausky v. Polish Roman Catholic Union, 219 Ind. 441, 457, 39 N.E.2d 440, 447 (1942). The Indiana rule governing damages for breach of a contract to lend money was stated in Lowe v. Turpie, 147 Ind. 652, 44 N.E. 25, 30, 32, 33, 47 N.E. 150 (1896):

> When the person who contracted to make the loan neglects or refuses to do so, and the [borrower] is compelled to procure the money elsewhere, the measure of damages, is the difference, if any, between the interest he contracted to pay, and what he was compelled to pay to procure the money; * * *. 44 N.E. at 32.

And in Indiana there is usually no abandonment of this rule simply because the borrower, like Stanish here, was unable to arrange a substitute loan elsewhere, even at a higher rate of interest.

> In contemplation of law, money is always in the market, and procurable at the lawful rate of interest. Smith v. Parker, 148 Ind. 127, 45 N.E. 770, 772 (1897).

While there is an apparent exception to this rule where a borrower is not given sufficient notice to arrange an alternative loan, Lowe v. Turpie, 44 N.E. at 31, Stanish has made no claim that his damages were the result of the tardiness of PRCU's notice to him that they would not lend him further funds. The fact that Stanish was not able to arrange alternative financing, perhaps because of his inexperience in real estate development and/or his lack of any substantial assets, does not change the fundamental Indiana rule that "money is always in the market, and procurable * * *." Id. at 33.

> [T]he fact that [the borrower] cannot procure the money, on account of being in embarrassed circumstances, will not entitle him to recover more than nominal damages; for the reason that no party's condition, in respect to the measure of damages, is any worse, for having failed in his engagement to a person whose affairs are embarrassed, than if the same result had occurred with one in prosperous circumstances. Id.

■ There is considerable authority outside Indiana for the proposition that a recovery for breach of a contract to lend money may include damages in addition to the higher interest rate of a substitute loan where such damages were reasonably within the contemplation of the parties. 11 Williston on Contracts § 1411; 5 Corbin on Contracts § 1078; Restatement of Contracts § 343 (1932). There is some Indiana authority for this rule in a case which involved the sufficiency of a pleading. Doddridge v. American Trust & Sav. Bank, 98 Ind.App. 334, 189 N.E. 165, 168 (Ind.App., en banc 1934). There it is suggested that the rule of Hadley v. Baxendale, 9 Exch. (Eng.) 341, 354 (1854) which set forth the rule of reasonably foreseeable damage for contracts generally, should be applied to breach of a contract to lend money. Although this is the only Indiana case we have found on this question, we believe that, when read together with the Indiana rule permitting damages in addition to higher interest costs when the borrower does not have enough time to arrange another loan, it is authority for us to hold PRCU liable for all damages it reasonably should have foreseen would result from its failure to advance Stanish the $260,000.

The district court's award of $707,000 in damages was made up of three items: $400,000, which the court found Stanish would have realized upon sale of the completed apartment building; $280,000, which Stanish would have realized on the sale of the four parcels of land adjacent to that upon which the building was to have been built; and $27,000, the amount by which Stanish's indebtedness to PRCU exceeded the value of the 8 acre site.

■ PRCU argues that this award of damages is improper for a number of reasons. Since there was no substitute loan, Stanish does not seek the usual

measure of damages in this case—the increased cost of borrowing from another source. In fact, PRCU asserts, and it is not controverted, that all expenses incurred by Stanish in his attempts to arrange financing to build his planned apartments were fully covered out of the proceeds of the $390,000 loan.[13] PRCU thus argues that all Stanish seeks is "lost profit" on this venture. PRCU points out that profits are generally awarded only for losses incurred by well-established companies which have proved their profitability; that no high-rise apartment building had ever been built in the area of Whiting, Indiana; and that Stanish, a beauty parlor operator and state senator, had no experience whatsoever in real estate development. In addition, claims PRCU, Section 90 of the Restatement of Contracts (1932) specifically limits holding promisors under the doctrine of promissory estoppel to cases in which

> injustice can be avoided only by enforcement of the promise.

PRCU argues that the court did not avoid injustice when it awarded Stanish more in damages than the original amount of the proposed loan; and PRCU notes that on a loan of $260,000 for two years, it would have earned only $36,400. Additionally, PRCU urges that only reliance damages are proper under the promissory estoppel doctrine, and that Stanish has not sought such damages. We have already concluded that, as to Stanish, the doctrine of promissory estoppel need not be applied, since PRCU's offer of a $650,000 loan had not been withdrawn when it was accepted by Stanish. Furthermore, the apparently disproportionate size of the damage award is not, without more, sufficient reason for us to interfere with the award of the district court.

In this case, however, we believe that the damages actually awarded to Stanish go beyond those for which PRCU may properly be held liable.

When PRCU refused to lend Stanish the additional $260,000, it surely realized that there could be no FHA-insured construction on that site, since the FHA insisted that Stanish must have clear title to the property before it finally approved its mortgage insurance. Assuming that PRCU would have released such parcel on the terms provided in the Letter of Commitment if Stanish could have borrowed the money elsewhere, it is clear that PRCU must have known no lender would lend Stanish, a man with no substantial personal assets and no real estate experience, the required $120,000, when PRCU itself had a first mortgage on Stanish's only significant asset, the building site. Thus, PRCU well knew, when it breached its contract to lend, that Stanish would not be able to construct his apartment building and would not be able to repay his $390,000 loan on the entire 8+ acre site. We therefore agree with the district court that Stanish should recover from PRCU the difference between the value of the entire site and the amount Stanish may still owe to PRCU on the $390,000 loan.

As to the remaining items of damage, Stanish's loss on the sale of the completed apartment building and the adjacent parcels of land on the site, we find that these items are not ones which can fairly be deemed "reasonably foreseeable."

The $400,000 which Stanish was awarded for his loss on the sale of the building was based upon successful completion of the building, 95% occupancy of the apartments therein, an estimated $40,000 net income from rents, and the estimate that investors in the area demanded a 10% return on their money. We cannot agree that the $400,000 gain upon the completion, successful leasing

---

13. After closing costs, proceeds of $369,711.60 were paid to Stanish. Of this amount $310,684 was used to retire the Hoosier loan. After miscellaneous fees, $58,879.60 remained to be used by Stanish to cover his expenses associated with the project. Stanish has not claimed that there are additional expenses for which PRCU should be held liable.

**726**

of its apartments, and sale of the building is a reasonably foreseeable result of PRCU's breach of its contract.

 Stanish here argues that while the *fact* of damage must be definitely established by a plaintiff, the extent or amount of such damage need not be shown with great exactitude for an award to be upheld. Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 562, 51 S.Ct. 248, 75 L.Ed. 544 (1931). Stanish asserts that while the figure of $400,000 may not have been determined with absolute precision, yet the fact of his damage was well established. Stanish believes that this case does not involve

> pure profits from a going business * * * so much as increases in basic real property value, raw land and improvements, values that are dealt with by courts on a regular basis in measuring damages. (Brief at 43).

The case of St. Paul at Chase Corp. v. Manufacturers Life Ins. Co., 262 Md. 192, 278 A.2d 12, cert. denied, 404 U.S. 857, 92 S.Ct. 104, 30 L.Ed.2d 98 (1971) is instructive of this aspect of the damage issue here. In *Chase* a lender refused to lend money in accordance with a letter of commitment upon which plaintiff had relied. Plaintiff sought to recover reliance damages, equity in the property, and "loss of business" which was determined, as Stanish and the court below have done here, by computing the difference between the value of the property as developed into an operating business, and the mortgage on the building. 262 Md. at 203; 278 A.2d at 17. *Chase* involved a refusal to lend money after construction of a high-rise apartment was substantially *completed*. Despite this the court disallowed such damages by adopting the opinion of the trial court which had held:

> Realization of profits from a new untried venture such as this depends on so many uncertainties that they cannot form a proper element of damage in a contract action, * * *. 262 Md. at 247; 278 A.2d at 38.

We believe that the court in *Chase* correctly stated the law. The $400,000 award for Stanish's "loss" on the sale of the building is even more speculative than that which plaintiff in *Chase* sought. The award of this item of damages must be set aside.

Stanish's "loss" on the projected sale of the four parcels of land adjacent to his proposed apartment building, which the district court found would have been "not less than $280,000.00 in excess of [the PRCU] mortgage" (Finding of Fact 40) must be set aside on similar grounds.

We remand this case to the district court for entry of a judgment which will insure that Stanish will recover from PRCU the amount, if any, by which he is indebted to PRCU after foreclosure proceedings, commenced when Stanish failed to repay the $390,000 loan, have been completed.

It is so ordered.