[No. 21042-4-I.    Division One.    February 20, 1990.]

NORTHWEST LAND & INVESTMENT, INC., ET AL, *Appellants,* v. NEW WEST FEDERAL SAVINGS AND LOAN ASSOCIATION, *Respondent.*

*Douglas R. Shepherd,* for appellants.

*William R. Hickman, Robert D. Johns, Pamela Okano, Marilee Erickson,* and *Reed McClure Moceri Thonn & Moriarty,* for respondent.

PEKELIS, J.— Northwest Land & Investment, Inc. (Northwest) and George R. Green appeal from the entry of a judgment of foreclosure and deficiency judgment in favor of New West Federal Savings and Loan (formerly American Savings, as assignee of the Federal Savings and Loan Insurance Corporation as receiver for American Savings and Loan Association) (American). Northwest, a developer who received two construction loans from American, alleges numerous errors in the proceedings below.

One jury trial and several hearings to the bench were held. The jury found that American had materially breached its contract with Northwest and violated the Consumer Protection Act. The court subsequently ordered foreclosure in favor of American and granted a deficiency judgment to it in the amount of $4,041,072.33, including interest. The court also determined that American's interests in the rents held by a court–appointed receiver had priority over other claims, including the attorney's lien of Northwest's counsel.

Northwest assigns error to the trial court's award of a deficiency judgment against it, arguing that it is inconsistent with the jury verdict, and in a related claim contends that the trial court erred in allowing American to set off its deficiency judgment by the amount of the jury's damage award to Northwest. Northwest makes a number of additional assignments of error which relate to alleged errors in the foreclosure and sale procedures. These include allegations that the trial court erred in allowing the rents to be applied to American's deficiency judgment, approving the sheriff's sale, setting an inappropriately low upset price, and dismissing Northwest's claims for wrongful foreclosure. It further assigns error to the trial court's allowing American to amend its complaint, the finding that Northwest had falsified certain expense vouchers submitted to American, and the refusal to admit certain exhibits. Northwest also seeks its costs and attorney's fees on appeal.

On cross appeal, American assigns error to the trial court's failure to dismiss Northwest's Consumer Protection

Act claim, alleging that Northwest did not demonstrate public interest impact. On the same basis, American assigns error to the award of costs and attorney's fees to Northwest on the Consumer Protection Act claim. American also asserts that counsel for Northwest has a conflict of interest in making the claims that its fees should be paid either from the damages awarded by the jury or from the rents, arguing that the effect of either would be to increase the deficiency judgment against Northwest.

## I
### FACTS

This case arises from a dispute relating to two construction financing loan agreements between Northwest and American, involving two residential developments in Bellingham: Sunrise and Maplewood Junction.

### The Sunrise Loan

Northwest purchased the property known as Sunrise in November of 1976 from a partnership composed of H. Gordon Walker and Colby Crabtree. The property was purchased in exchange for a promissory note secured by a deed of trust. The agreement required Crabtree/Walker to subordinate their interest to a construction loan. Northwest obtained financing for the project from Rainier Mortgage Company for 9 single–family homes and 47 townhouses. Crabtree/Walker subordinated their deed of trust in favor of Rainier in the amount of about $1.1 million.

In mid–1978 Rainier withdrew from the condominium financing market and Northwest was forced to look elsewhere for financing the balance of its project. It was unsuccessful in this effort for over 2 years and construction stopped in 1979. Northwest became delinquent that year on the Crabtree/Walker note, which was never again brought current.

In September 1981, Northwest contacted American's predecessor company through a loan broker retained by Northwest. In a loan that closed September 24, 1981, American agreed to loan up to $3.81 million to provide

financing for 15 single–family houses and 38 condominiums. The maturity date for the loan was November 1, 1983, with the option of a 2–year extension. Northwest executed a promissory note secured by a deed of trust, and G.R. Green signed a personal guaranty. The note provided for interest at the greater of 15 percent per annum or 2 percent over the prime rate. The construction loan agreements made no reference to phasing the funding based on sales.

The loan agreement required that American's deed of trust would have priority over all other liens. Accordingly, Northwest recorded an agreement allegedly signed by Crabtree and Walker subordinating their interest to American.

### The Maplewood Loan

Northwest and American entered into a second loan agreement on September 28, 1981. American agreed to loan up to $2,747,400 to provide financing for the construction of 68 condominiums. The terms parallel those of the Sunrise loan, with the exception that the interest rates were the greater of 13 percent per year or 2 percent over the prime rate.

### Construction and Sales

In December 1981, American advised Northwest that it intended to phase the financing by limiting buildings starts in Sunrise to 15 single–family homes and in Maplewood to 33 of the planned 68 units. American indicated that further funding would be phased according to sales, though it later authorized an additional 12 units to be built in Maplewood.

Three of the fifteen homes in Sunrise were sold in 1982. Because of the lack of sales activity, 11 of the remaining homes were rented. Only one unit in Maplewood was sold; the remaining 44 units were rented.

Northwest objected to American's withholding of the financing, taking the position that the units were unmarketable because of the lack of completion of the project. American did not, however, relax its restriction on the funds.

## Loan Extension Agreements

In November 1983, the parties agreed to a 1–year extension for both loans. The extended due date was set at November 1, 1984. The extension agreements each provided that the "all due and payable date for the remaining amount of principal and interest accrued is hereby modified to November 1, 1984." Northwest advised American by letter that it interpreted this language to mean that there would be no interest payments due until November 1, 1984. American, however, interpreted this language as requiring a continuing monthly interest payment, which Northwest failed to make.

## Proceedings Before the Trial Court

American issued notices of default in April and May of 1984, and commenced a nonjudicial foreclosure action in June of 1984.[1] In July 1984 Northwest and Green filed suit against American, seeking to enjoin the nonjudicial foreclosure sales and seeking damages for breach of contract. The trial court entered an order enjoining the sales contingent upon the posting of a bond by Northwest. Northwest did not post a bond. Nonetheless, American elected to terminate its nonjudicial foreclosure action and instead counterclaimed in Northwest's action for judgment on the notes and judicial foreclosure.

American joined Crabtree, Walker and others as third party defendants. Crabtree and Walker denied that their deed of trust was subordinate to American's interest, claiming that they had never signed the subordination agreement. They claimed that Northwest was in default on their note and requested foreclosure and a deficiency judgment.

After filing its answer and counterclaim, American moved for the appointment of a receiver to collect rents, which the trial court granted over the objection of Northwest.

---

[1]The trial court subsequently found that these notices were issued prior to the all due and payable date for the loans pursuant to the modification agreements.

Northwest answered American's counterclaims, and asserted additional claims for fraud, wrongful foreclosure, violation of the Consumer Protection Act and negligence.

A jury trial was held on Northwest's breach of contract and Consumer Protection Act claims, commencing February 9, 1987. Northwest proposed instructions which would disallow any subsequent deficiency judgment against Northwest if American were found to have breached its contract. Following a chambers conference which was not transcribed, the court read its proposed instructions on the record. The court's instructions did not include Northwest's proposed instructions and made no reference to a possible deficiency judgment. Northwest did not take exception either to the court's instructions or to the court's failure to give Northwest's proposed instructions.

The court instructed the jury as follows:

> This case involves claims by plaintiff that defendant has breached its contract with plaintiff and has violated the Consumer Protection Act. This case also involves a claim by defendant that plaintiff is obligated to make payment on the two promissory notes and that if plaintiff fails to make payment, foreclosure on the two projects should occur. The Court will decide the issues related to defendant's claims against plaintiff. Your role is to decide the damage claims of the plaintiff against the defendant.
>
> In your deliberations you should not concern yourselves with any issues involving claims defendant may have against plaintiff.

Instruction 6.

> Plaintiff claims that defendant contracted to provide funds for the construction of two residential housing developments . . .. Plaintiff claims that defendant breached these contracts by failing to provide such funds . . . [and] by failing to pay in a timely manner the vouchers submitted by plaintiff within the time period provided by the contracts. Plaintiff claims it was damaged as a proximate cause thereof.

Instruction 7.

> The plaintiff has the burden of proving each of the following propositions by a preponderance of the evidence regarding its breach of contract claim:

1. That the parties entered into a contract . . . to provide funds for the complete construction of two residential housing developments . . .

2. That the defendant breached the contract or contracts in one or more of the following ways:

    a. By failing to provide funds which would allow completion of the developments.

    b. By failing to provide below market take–out financing.

    c. By failing to pay vouchers in a timely manner.

3. That plaintiff was damaged.

4. That plaintiff's damages were proximately caused by defendant's breach or breaches of the contract(s).

Instruction 12.

The purpose of awarding damages for breach of contract is neither to penalize the defendant nor merely to return to the plaintiff that which he has expended in reliance on the contract. It is, rather, to place the plaintiff, as nearly as possible, in the position he would be in had the contract been performed. He is *entitled to the benefit of his bargain, i.e., whatever net gain, if any, he would have made under the contract if the breach had not occurred.* . . .

(Italics ours.) Instruction 21.

It is the duty of the court to instruct you as to the measure of damages. . . .

If your verdict is for the plaintiff, then you must determine the amount of money which will reasonably and fairly compensate the plaintiff for such damages as you find were proximately caused by the breach of contract or unfair act or practice in violation of the Consumer Protection Act of the defendant.

If you find for the plaintiff, you should consider the following elements:

    (1) *Profits lost* on the construction and sale of units in the Sunrise and Maplewood projects;

    (2) *Monies invested* by plaintiff in the Sunrise and Maplewood projects. You should deduct the net rental income obtained by plaintiff from the two projects.

(Italics ours.) Instruction 27.

The jury found that American's refusal to advance the loan proceeds in a timely fashion proximately resulted in damages to Northwest due to lack of sales and was a material breach of the construction loan agreements on both developments. It further found that American had violated the Consumer Protection Act. It awarded Northwest

$505,169 in damages which was approximately half of the amount sought by Northwest. Northwest was also awarded $10,000 in treble damages and $124,745 in attorney's fees and costs pursuant to the Consumer Protection Act, RCW 19.86.

At several subsequent hearings, Northwest moved for entry of judgment on the jury verdict. Each time, the court either did not rule on the motion or denied it.

### Judicial Foreclosure Decision

After the jury verdict, American moved pursuant to RCW 61.12.060 for a judgment of foreclosure.[2] Northwest moved for an order denying foreclosure or, alternatively, disallowing a deficiency judgment.

Following a hearing on these motions, the trial court ruled on August 7, 1987, that American was entitled to foreclosure, and entered a single net judgment in favor of American for the amount due on the notes, $7,124,904.40. Since it also found that Northwest had failed to subordinate the Crabtree/Walker interest, it also awarded American $88,309.56, for a total of $7,213,213.96.[3] This amount was offset by Northwest's jury verdict and attorney's fee and cost award, for a net judgment of $6,570,556.44. The trial court ruled that Crabtree/Walker had priority over the interests of American in the Sunrise property and entered a judgment of foreclosure in favor of them in the amount of $88,309.56.[4]

---

[2]This was, in essence, a hearing on American's counterclaims which had not been submitted to the jury.

[3]Crabtree and Walker had been deposed in preparation for trial on the foreclosure claims and testified that the signatures on the subordination agreement were not theirs. American had then been permitted to amend its counterclaim to request damages in the amount of Northwest's outstanding obligation to Crabtree and Walker, in the event that the subordination agreement was held invalid.

[4]This amount was ultimately paid by American, and the judgments were appropriately adjusted.

On August 18, 1987, the court entered an order of sale regarding both parcels. Northwest's motion to quash the order of sale was denied.

### The Foreclosure Sale and Deficiency Judgment

On October 9, 1987, the properties were sold at a sheriff's sale to American. American, the only bidder, purchased Maplewood for $1,350,000 and Sunrise for $1,221,000. An order confirming sale was entered by the court over Northwest's objection on November 12, 1987. The same day the trial court confirmed the sale and entered a deficiency judgment in the amount of $4,041,072.33 against Northwest and Green.

### Rents and the Receiver

The loan agreements required Northwest to execute a "Deed of Trust . . . being a deed of trust and an assignment of rents . . . as security for payment of the Note and of Borrowers obligations in connection with this loan." Accordingly, the deed of trust provided that Northwest would convey the property, "together with all the tenements, . . . and the rents, issues and profits thereof." These deeds were recorded in 1981.

On May 3, 1985, the trial court appointed a receiver for both properties, who was ordered to collect all rents and place them in a trust account pending the outcome of the litigation. After foreclosure and confirmation of sale, the court ordered the rents applied against American's deficiency judgment by order dated December 11, 1987. Northwest's motion for reconsideration on the application of rents was denied.

This timely appeal followed.

## II

### ANALYSIS

The primary issue presented by Northwest in this appeal is whether a trial court may enter a deficiency judgment in favor of a construction lender whose breach of a contract to

lend money resulted in the borrower's inability to complete development of and make a profit on a project. We conclude that under the circumstances presented here, a deficiency judgment should not have been entered by the trial court.

The principal issue raised by American in its cross appeal is whether the trial court erred in not granting its motion to dismiss Northwest's Consumer Protection Act claim. We conclude that it did not err, since sufficient evidence was presented to sustain the jury's verdict.

### Deficiency Judgment

Northwest argues that since the jury found American had materially breached its contract and caused damage to Northwest for lost profits, the jury's damage calculations must have considered the funds borrowed and assumed repayment. Thus, it was inconsistent to subsequently order Northwest, in the form of a deficiency judgment, to repay the loan amounts that remained unsatisfied after the property had been sold. Moreover, Northwest argues, such a deficiency judgment rewards the wrongful conduct of American, effectively permitting it to benefit from the contracts it had breached.

American responds that the jury was specifically instructed in jury instruction 6 (quoted above) that it should not concern itself with any issues involving American's claims against Northwest, and thus we must presume that the jury's damage award did not take into account the possibility that Northwest would have fully repaid the loans and made a profit. American alleges that Northwest waived any error in this regard by failing to object to instruction 6.

Furthermore, American claims that there is no inherent inconsistency between the jury's determination and a deficiency judgment, since the trial court determined in finding of fact 29 that "the damages awarded by the jury were not

an award of net profits, but an award of general damages." Northwest assigns error to this finding of fact.[5]

In order to determine whether the jury's award was inconsistent with a subsequent deficiency judgment, we first review some basic principles of contract damages. Generally, the measure of damages for breach of contract is that the injured party is entitled to recovery of all damages naturally accruing from the breach, and to be put in as good a position as he would have been in had the contract been performed. *Eastlake Constr. Co. v. Hess,* 102 Wn.2d 30, 39, 686 P.2d 465 (1984). Said more simply, the plaintiff is entitled to the benefit of his bargain, that is, whatever net gain he would have achieved. *Platts v. Arney,* 50 Wn.2d 42, 46, 309 P.2d 372 (1957). Damages for a breach of contract to loan money are recoverable if they were reasonably foreseeable when the contract was made, are the natural and proximate results flowing from the breach, and are proved with reasonable certainty. *Lincor Contractors, Ltd. v. Hyskell,* 39 Wn. App. 317, 321, 692 P.2d 903 (1984), *review denied,* 103 Wn.2d 1036 (1985). A number of methods have been derived for computing damages in construction contracts and cases involving a lender's breach to loan money. These include restitution, lost profits, and a lost equity approach. *See Lincor,* 39 Wn. App. at 326–27 (Ringold, J., concurring in part, dissenting in part). Here, the plaintiff argued and the trial court instructed the jury on a lost profits theory of recovery.

Courts have held in a number of jurisdictions that having to pay a deficiency judgment following foreclosure of a mortgage is a foreseeable element of damages to a debtor resulting from a lender's breach of a contract to loan money. For example, in *St. Paul at Chase Corp. v. Manufacturers Life Ins. Co.,* 262 Md. 192, 278 A.2d 12, *cert. denied,* 404 U.S. 857 (1971), a permanent mortgage lender

---

[5]This "finding of fact" is, in reality, a conclusion of law not supported by any of the other findings of fact of the trial court.

canceled its commitment to a contractor, resulting in fore-
closure and a deficiency judgment against the contractor by
a construction lender. In holding that foreclosure was a
foreseeable result of the permanent lender's withholding of
funds, the court (quoting the trial court's holding) said:

> [T]he . . . lender must contemplate that if, at the last min-
> ute, it cancels its commitment such action would be disas-
> trous to the borrower; that in such event obtaining a new
> permanent mortgage loan would be well–nigh impossible, for
> the reason that whatever brought about the cancellation
> would in all likelihood prevent another lender from entering
> the fray; that one doesn't find someone willing and able to
> lend $4,800,000 at a moment's notice; that, under such cir-
> cumstances, foreclosure under the construction mortgage
> would not only be a probability, it would be almost inevi-
> table.

*St. Paul,* at 243. Thus, the court allowed as consequential
damages $1.8 million which was the amount of the defi-
ciency decree obtained by the construction lender "plus
accrued interest." *St. Paul,* at 200, 234–36, 250. The court
went on to hold that in order to place the injured borrower
in the position he would have been if the contract had not
been breached it was necessary to require the lender to pay
the borrower "such a sum as will enable it to liquidate its
obligation under the deficiency decree.'" *St. Paul,* at 250.

In another case, *Stanish v. Polish Roman Catholic
Union of Am.,* 484 F.2d 713 (7th Cir. 1973), the court
employed an equity method of computation to determine
that a debtor/contractor should recover from a defaulting
lender the difference between the value of the building site
less the amount owed on the loan. *Stanish,* 484 F.2d at 725.
However, as there was a separate foreclosure action pend-
ing, the court remanded the case to the trial court "for
entry of a judgment which will insure that [the debtor/
contractor] will recover from [the lender] the amount, if
any, by which he is indebted to [the lender] after foreclo-
sure proceedings . . . have been completed." *Stanish,* 484
F.2d at 726. Thus, as in *St. Paul,* the court ensured that the
debtor would not be ultimately responsible for paying a
deficiency judgment.

American attempts to distinguish *St. Paul* and *Stanish* because Northwest did not except to instrution 6 and because it withdrew its request for instructions under which the jury would have decided the issue of whether American could recover a deficiency judgment against Northwest. American claims that the plaintiffs in *St. Paul* and *Stanish* asked for the deficiency amount to be considered as a part of its claim.

██ ██ We see no reason, however, to require Northwest to have excepted to instruction 6. Northwest's appeal is not *from* instruction 6. The appeal is from the judgment of foreclosure, in which the trial judge ordered a deficiency be paid. Northwest does not argue and we do not hold that the jury should have considered the deficiency issue; rather, we apply general principles of the law of contract damages to the facts presented here and hold that the jury's verdict necessarily assumed repayment of the loan, *i.e.,* took into account the reasonable foreseeability of a deficiency judgment.

The record makes it clear that the jury intended to award Northwest its lost profits. For example, the jury was instructed in instruction 21 to give the plaintiff the "benefit of his bargain," and to award "whatever net gain, if any, he would have made under the contract if the breach had not occurred." Instruction 27 told the jury to consider lost profits and moneys invested in its damage calculations. When considered as a whole, the instructions clearly show that the jury awarded the plaintiff lost profits. Further, both parties argued to the jury they should calculate lost profits. Implicit in the jury's finding that the breach proximately caused Northwest to be unable to complete the project and sell the units is that the breach also rendered Northwest unable to repay its loans.

Furthermore, as Northwest points out, American characterized the jury's award as lost profits in posttrial memoranda opposing the granting of prejudgment interest to Northwest. If the jury's verdict had been merely a restitution calculation, for example, as American argues it may

have been, it would have been possible to award Northwest prejudgment interest. However, characterizing it as a lost profits award, as American did, precluded the award of prejudgment interest, since it would have been an unliquidated amount prior to the jury's verdict. A party may not use theories or arguments to its advantage at trial and then argue on appeal that the theories are erroneous. *Zimmerman v. Kyte,* 53 Wn. App. 11, 14, 765 P.2d 905 (1988).

The jury found American to have materially breached the loan agreement, and further expressly found that the breach proximately caused Northwest's damages. Further, the jury was instructed on a lost profits theory of damages. We therefore conclude that under such circumstances, it is inconsistent with the jury's finding of liability to award the breaching lender a deficiency judgment from a sale. Thus, we hold that the trial court erred in entering a deficiency judgment against Northwest, and we reverse the judgment of foreclosure insofar as it provided for such an award. We remand for entry of judgment on the jury verdict in favor of Northwest in the amount of $505,169.

Due to our holding, it is unnecessary to reach Northwest's remaining arguments in support of its contention that American should be denied a deficiency judgment. Similarly, we need not reach Northwest's arguments pertaining to setoff of American's deficiency judgment by the amount of the jury's damage award or American's arguments that counsel for Northwest had a conflict of interest in seeking its fees from the jury's damage award. Our holding also compels reversal of the award of prejudgment interest to American. All of Northwest's claims relating to alleged sale improprieties are also moot, since under our holding above, no sale should ever have been held; rather, the property should simply have reverted to American.

We now briefly address Northwest's remaining viable assignments of error as well as American's cross appeal.

Because these do not raise issues of precedential importance, the remainder of this opinion is unpublished. *See* RCW 2.06.040; CAR 14.

SCHOLFIELD and WINSOR, JJ., concur.

Reconsideration denied April 25, 1990.

Review denied at 115 Wn.2d 1013 (1990).