IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| JOHANNA GRIDER, a single woman, | ) | |
| | ) | No. 37433-5-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CHRISTOPHER QUINN, a married man; | ) | UNPUBLISHED OPINION |
| CHRISTIAN PANG, a single man; | ) | |
| ALKALOID INC., a Washington corporation, | ) | |
| | ) | |
| Appellants | ) | |
| | ) | |
| LUCID NORTH SPOKANE, LLC, a | ) | |
| Washington Limited liability company, | ) | |
| | ) | |
| Defendant. | ) | |

FEARING, J. — Christopher Quinn, Christian Pang, and Johanna Grider formed a partnership to own and operate a marijuana retail sales outlet. The three placed Grider in control of daily operations. When Grider refused to use funds segregated for payment of sales taxes in order to purchase more product, Quinn and Pang took aggressive and oppressive actions to terminate Grider's employment and thwart her ability to gain any profit from the business. The superior court granted Grider damages and other relief. We affirm most of the superior court's rulings.

FACTS

Appellants Christopher Quinn, Christian Pang, and Alkaloid, Inc. do not challenge any trial court finding of fact. Therefore, we outline the facts primarily from the fifty-five pages of findings of fact.

The dispute on appeal concerns control of a marijuana retail business, which we often refer to as "the partnership" or the "marijuana retail store." Washington State legalized medical marijuana in 1998. In 2012, the State broadened the law to permit limited retail sales of recreational marijuana. The legislature appointed the Washington State Liquor and Cannabis Board (LCB) the task of allocating and granting licenses to sell recreational marijuana. The State refers to the licenses as "i502 licenses," based on the initiative number that legalized recreational marijuana. Only one with an i502 license may legally sell recreational marijuana.

The LCB, at the inception of legal recreational marijuana, limited the issuances of i502 licenses. The LCB assigned applicants for a license a priority status based on meeting certain criteria. Because of the demand for i502 licenses, only those applicants assigned a priority one status stood a chance of obtaining a license. The LCB granted priority one status applicants a provisional license that expired by a certain date if the applicant did not fulfill conditions.

Locating and securing an approved retail site to sell recreational marijuana under an i502 license loomed as the biggest stumbling block for most license applicants. Cities and counties imposed significant restrictions on the location of establishments within

2

their respective jurisdictions in addition to curbs imposed by the LCB. For example, a city or county might allow only one store within a designated geographic boundary, and that one store would also need to conform to LCB regulations, such as a prohibition of an i502 store within a certain distance from a school, church, or another i502 store. Priority one applicants hurriedly attempted to acquire a suitable location. Some priority one applicants never secured a retail sales license from the LCB because of an inability to procure a permitted retail location.

On January 2, 2016 appellant Tacoman Christopher Quinn formed a corporation, Alkaloid, Inc., for the purpose of owning and operating a marijuana retail outlet. In March 2016, the LCB granted Alkaloid priority one status for an i502 marijuana recreational license.

As was typical for all prospective marijuana retailers, Alkaloid needed to procure an approved location for its i502 retail store before LCB would grant the final license. The LCB imposed a thirty-day deadline in garnering a retail location. Because the allotted licenses in counties near Quinn's home of Tacoma filled quickly, Quinn searched for a location in eastern Washington. According to Quinn, he engaged in a "race" with others to find a viable location.

Christopher Quinn lacked familiarity with eastern Washington. Consequently, he sought help finding a suitable location. Quinn also lacked funds to hire anyone to assist in finding a retail site, but he would offer the helper an interest in Alkaloid or the i502 license. A desperate Quinn met Christian Pang, when twenty-one days remained on the

3

provisional i502 license. Pang wished to partner with different retailers because of his larger goal of introducing his Lucid brand of marijuana to numerous markets. Pang then had marijuana retail store license applications pending in New Jersey and Michigan.

Christopher Quinn offered Christian Pang seventy percent ownership in the i502 license pending for Alkaloid, Inc., if Pang located a retail site. Pang did not then know respondent JoHanna Grider. Dennis Turner, a mutual acquaintance of Pang and Grider, introduced the two to one another. Grider possessed years of experience in selling medical marijuana, in Elk, a bedroom community of Spokane. Grider knew of a potential retail location and desired to expand into the recreational marijuana market. Grider had already been approached for assistance by two other potential i502 licensees.

Johanna Grider introduced Christian Pang to a location in north Spokane, 11414 N. Newport Highway, and Pang approved of the site. Pang and Grider then negotiated her participation in the i502 license and the business based on the license. Grider only conversed with Pang because he represented to Grider that he held authority from Christopher Quinn to fragment his seventy percent ownership in the project to others. During trial, Pang and Grider testified that, throughout the negotiations, the two agreed that the ownership interest in the license would be split among Quinn, Pang, and Grider, since each partner contributed value to the i502 license. Pang provided his Lucid branding. Grider contributed the business location. Quinn supplied the i502 license.

Johanna Grider and Christian Pang recognized, during negotiations, Grider's bargaining power because the license application failed without a feasible location.

4

During negotiations, Grider's percentage of ownership in the i502 license varied from forty percent to sixty percent. Because Grider, unlike Pang and Quinn, resided in the Spokane region and would work at the marijuana retail store, Grider also negotiated for a salaried employment position. According to Grider, she and Pang eventually agreed that Grider would receive forty percent ownership of the license and a salaried position of $7,500 per month. At trial, Pang conceded talking to Grider about a salary, but denied any agreement to pay $7,500 per month.

Johanna Grider wished a writing memorializing the terms of her agreement with Christian Pang and Christopher Quinn before she procured the retail location. Accordingly, in a March 30, 2016 e-mail from Christian Pang to Grider, Pang summarized the terms of a "preliminary agreement" with Grider. The e-mail read, in part:

> This is the preliminary agreement between Johanna Grider and Christian Pang and the 502 license applicants he represents. . . Johanna will assume 40% of the license and a salary position after acquiring the [i]502 retail license for her part in obtaining the premise [sic] and future works with the company.

Exhibit (Ex) at P-15 (emphasis added). The parties often referred to ownership interest in the i502 license, which we deem to be an ownership interest in a partnership that held the license.

On April 12, 2016, Pang sent a similar email to his attorney, Thor Hoyte, which message summarized the terms of the negotiated partnership agreement. The email declared:

5

> Equity to be divided upon licensing 40% [f]or Johanna [sic] 55% between Endo, Inc. [Alkaloid, Inc.] and Lucid Management [Pang's company] 5% to be a finders [sic] fee goes to Dennis turner [sic].

Ex. P-21. Turner had introduced Pang to Grider.

Based on the e-mail representations, Johanna Grider procured the location at 11414 N. Newport Highway in Spokane and proceeded with renovations required by the LCB to operate a retail outlet. The premises had been a log home. The LCB would not issue the i502 license until an inspection of the store premises confirmed its compliance with LCB rules. Although the applicant need not conform to all rules by the time of inspection, the LCB required at a minimum that security and surveillance cameras be installed.

Johanna Grider assumed the responsibility of preparing the store premises, under time constraints, for the LCB inspection. Grider had only two weeks to install the security system, including cameras. A potential competing store one hundred yards away also hurried to procure a license.

During her reconstruction of the retail store premises, Johanna Grider requested, from Christian Pang, a more formal agreement. Accordingly, Pang drafted a Partnership Agreement. The agreement's opening declared:

> The purpose of this contract is to form a partnership between Christopher Quinn of Endo Inc., Tacoma WA, Christian Pang of Lucid Management LLC Olympia WA, and Johanna Grider of JD's Collective Elk WA. After receiving the Washington state marijuana retail license at 11414 N. Newport Hwy. Spokane WA 99218[,] Christopher Quinn agrees to partner with Pang of Lucid Management and Grider of JD's Collective for the purpose of owning the LCB issued marijuana license and operating a 502 marijuana retail store. For the contributions put forth by Pang and

6

Grider in obtaining the 502 retail license[,] Quinn agrees to give Pang 37% and Grider 33% ownership of the license.

Ex. P-1. Endo, Incorporated was a business name for Alkaloid, Inc. Christopher Quinn initially wished to name the i502 store "Endo," before Pang convinced him to use the Lucid name. RP 746. Quinn and Pang signed the Partnership Agreement on April 23, 2016. Grider signed on April 27, 2016. According to Christian Pang, he drafted the partnership agreement to secure Grider's and his partial ownership interest in the i502 license. Not surprisingly, he intended, based on the partnership agreement, that Quinn, Grider, and he be partners.

On April 27, 2016, the LCB inspected the North Spokane retail premises. The LCB found the premises in compliance and granted the marijuana retail license for the N. Newport Highway site. By that date, Grider had spent $14,000 of her own money for real property improvements.

Even with the issuance of the i502 license, the premises at the Newport Highway address needed substantial renovations before the LCB would permit the sale of marijuana. The three partners had never discussed, during negotiations, the funding of store renovations. The partnership could not use the North Spokane building as security for funding since the partnership rented the premises. Quinn and Pang lacked the resources and desire to fund the improvements or to obtain needed credit. An unemployed Quinn owed back taxes on a medical marijuana business. Pang owed $300,000 in back taxes to the Internal Revenue Service. Pang occupied most of his time on other projects and did not wish to devote time to the partnership retail store.

7

Christian Pang and Christopher Quinn convinced Johanna Grider to obtain a personal loan to fund the North Spokane premises' improvements. Although Grider could not self-finance the improvements, she maintained the credit needed to obtain a loan. At the urging of Pang, Grider offered land she owned as collateral for a personal loan. On behalf of Quinn and the partnership, Pang promised Grider that the partnership would repay Grider for the loan. Grider procured two loans totaling $115,000, from a lender identified by Pang, to fund the building renovations and initial operating expenses of the partnership store. The loan had a two-year term with interest at the high rate of twelve percent. Grider only contributed $90,273.37 of the loan to the partnership. Grider paid monthly interest payments of $1,150 with the entire principal balance due June 16, 2018.

After acquiring the loan in reliance on the partnership promise to repay the renovation loan and to pay her a salary of $7,500 per month, Johanna Grider exerted personal efforts to prepare the premises for retail sales. She worked at the partnership store seven days a week from April through June 2016. Among other remodeling, the building needed a sunken floor leveled for handicapped persons. Grider also organized contractors to lay a parking lot, build cabinets, add security glass, fashion lighting, and install additional cameras and sensors.

Although Christopher Quinn, Christian Pang, and Johanna Grider executed a partnership agreement, Grider also wanted a written contract confirming the partnership's promise to pay her a salary and to repay the loans she acquired on behalf of the marijuana

business. Grider pestered Pang nearly every day for this additional document. Pang continually assured her he would complete a contract. Pang circulated several proposed agreements by e-mail in the summer of 2016.

Christopher Quinn had promised to transfer the i502 marijuana license to the partnership. He failed to do so. As of trial, Alkaloid, Inc. continued to hold the license.

At some unknown date, after Alkaloid received its i502 license, Christian Pang withdrew from the partnership, or at least, at trial, he so claimed. No document confirmed Pang's transfer of his partnership interest to a third party. The LCB limited individuals from associating with three different i502 licenses. Pang was already associated with two licenses, Lucid Lacey and Lucid Olympia, and worked with others to secure additional licenses. Pang eventually affiliated with a license at a Cheney location because of his belief that a college town would accrue a higher profit than the North Spokane location. Christian Pang, Dennis Turner, and Christopher Quinn never informed Johanna Grider of Pang's removal from the partnership or any agreement to pay Pang for his services.

Despite his alleged withdrawal from the partnership, Christian Pang continued to purchase marijuana for the North Spokane store. He also provided other assistance as needed. He drafted all partnership and corporate documents. He later attended meetings, during which he and others schemed to oust Grider from management and ownership of the partnership retail store.

9

Christian Pang circulated an Alkoloid (sic) Preferred Stock Purchase Agreement. No lucid judge can comprehend the meaning of the agreement. The stock purchase agreement mentioned no obligation to pay Johanna Grider a salary or repay the loans issued to Grider. The end of the document listed the names and contained signature lines for five persons. The end read: Chris Quinn 25 percent, Heather Iwerks 32 percent, Johanna Grider 33 percent, Dennis Turner 5 percent, and Kenneth Williams 5 percent. Pang selected Iwerks, his cousin, as a straw woman to hold his interest in the corporation. Kenneth Williams was the brother-in-law of Quinn. Grider had never heard of Iwerks or Williams before.

Christian Pang assured Johanna Grider of the suitability of the Alkoloid Preferred Stock Purchase Agreement. Grider disagreed and insisted on another draft to conform to the parties' agreement. Grider signed the document, however, on the assurance that an appropriate contract would be forthcoming. At trial, Christopher Quinn testified he did not understand the purpose or terms of the stock purchase agreement prepared by Pang.

Johanna Grider testified that, despite the purported change in the business structure to a corporation from a partnership, the corporation never issued her any shares. No one consulted her about adding Heather Iwerks, Dennis Turner, or Kevin Williams as shareholders or removing Pang as an owner. No one discussed with her a transformation of the partnership to a corporation or a limited liability company or the addition of a partner to the partnership. She later learned that Christian Pang, without consent from

10

other partners, assigned five percent of his share of the partnership to Dennis Turner as a finder's fee for connecting Pang with Grider.

We continue to refer to the business as a partnership rather than a corporation, because the superior court deemed the parties' relationship to be one of partners. The partnership marijuana retail store opened on July 19, 2016. Soon thereafter, Christian Pang sent Johanna Grider another document entitled "Operating Agreement of Alkoloid [sic] Inc." Ex. P-5. Pang employed a form document, when drafting the operating agreement. A lucid attorney cannot comprehend the meaning of the agreement.

Christian Pang prepared a Schedule II to the Operating Agreement. The schedule included a roles and responsibility chart that identified Johanna Grider as the general manager. Grider adjudged the agreement to memorialize the partners' agreement to provide her a paid position at the retail store. Pursuant to the agreement, Pang directed assistant manager Allison Ninemire to issue monthly wage payments to Grider. Grider received $18,750 between mid-August and October 2016.

The partnership marijuana store ran smoothly for two months and began turning a profit. The business, being new, held limited funds. So Johanna Grider limited the amount of marijuana products purchased. Grider also reserved sufficient funds to pay, on a monthly basis, the high taxes owed on marijuana sales. Christian Pang and Christopher Quinn demurred. Pang and Quinn wanted tax reserves employed to purchase more product and thereby make quicker profits, a practice known as flipping. Pang and Quinn had not learned a lesson from their respective large tax debts. Grider knew that those

11

who engaged in flipping incurred increasing tax debt because quick additional sales often do not follow. Grider rejected Pang's and Quinn's entreaties to invade tax reserves.

On October 24, 2016, Christopher Quinn and Christian Pang physically excluded Johanna Grider from the North Spokane retail outlet. A furious Grider notified Pang that she refused to leave the partnership. She reminded Pang of the money owed her.

On the night of October 24, Christian Pang, Johanna Grider, and Christopher Quinn convened a business meeting in a Spokane restaurant. Quinn appeared by phone. Dennis Turner and Grider's husband also attended the meeting. Grider vociferously complained about her lockout after her labor in opening the partnership store and the store's success. Pang and Quinn relented and agreed to Grider's return to management of the store. They refused to pay her a salary, but agreed to begin payments on the debt incurred by Grider. Grider considered Pang and Quinn in breach of the partnership agreement, but yielded to the arrangement in order to return to the store. Grider testified:

> It was three against one. It was Turner, Quinn and Mr. Pang. They were all against me[,] and I had to agree just to get back to the store.

Report of Proceedings (RP) at 288-89.

During the October 24, 2016, meeting, the partners also discussed the i502 license. Contrary to his promise, Christopher Quinn had not yet transferred the license to the partnership. Quinn once again agreed to transfer the i502 license from Alkaloid Inc. to the partnership. Under LCB rules, only Quinn was authorized to submit paperwork to transfer the license. The partners discussed changing the name of the partnership store to Lucid North Spokane, LLC. We do not know if the limited liability company had been

12

formed by then. According to Grider, the partners at some unidentified time formed

Lucid North Spokane, LLC for the sole purpose of holding the lease to the business

premises.

Christian Pang testified that he drafted the numerous documents, succeeding the

partnership agreement, at the request of Christopher Quinn because of Johanna Grider's

insistence on additional assurances. Pang adjudges himself to be a trustworthy leader in

the marijuana retail industry. Because of his leadership skills, he volunteered to assist

Quinn because of Quinn's lack of money for an attorney. At trial, Pang declared:

> At this time, they didn't have a lot of money and they kept coming at me and saying we need help with this or this. I had a few documents laying around. I changed the names. I gave it back to them and said, "hey, you know, if you need something that is somewhat binding, here you go."

RP at 763. We do not know the extent of the binding nature of a "somewhat binding"

document.

As a result of the October 24 meeting, Christian Pang, on November 6, 2016, sent

an e-mail to Johanna Grider, Christopher Quinn, and Dennis Turner that outlined the

roles and responsibilities of the members. The message described Grider's role as

management of daily partnership store operations, overseeing the budget, supplies, and

employees, and "voting on 'LLC decisions.'" Clerk's Papers (CP) at 203. In the e-mail,

Pang wrote that the parties would enter a separate agreement with regard to the debt

incurred by Johanna Grider on behalf of the partnership.

Johanna Grider responded to Christian Pang's e-mail of November 6 on the same

day. Grider denoted agreement with Pang's description of her role. She added that:

13

> Something needs to [be] put in the agreement that one member cannot just decide to kick people out of the shop when they get mad cause I will not deal with the crap again. It has to be a vote.

Ex. P-17.

Christian Pang drafted a new document entitled "Roles and Responsibilities Agreement of Lucid North Spokane, LLC." Ex. P-3. The document confirmed Johanna Grider's role as general manager of the partnership store. The agreement mirrored the description of her duties as outlined in the unsigned Alkoloid (sic) Operating Agreement. Johanna Grider, Christopher Quinn, Christian Pang, Dennis Turner, and Kenneth Williams electronically signed the Roles and Responsibilities Agreement on November 14, 2016. The agreement did not list Heather Iwerks as a member of the LLC. Pang signed despite his purported withdrawal from the partnership. Grider deemed the agreement an employment agreement that reinstated her monthly salary.

Beginning in November 2016, the marijuana partnership no longer paid Johanna Grider a salary. The store paid her an hourly rate, but only if she covered for another worker's shift. The partnership paid Grider, in periodic payments, $57,500 between November 1, 2016 and June 1, 2017. Christopher Quinn and Christian Pang testified at trial that they intended the payments to retire the debt for the loan. Their accountant testified that he asked the pair about the purpose of the payments, and neither gave an answer. The accountant listed the payments as dividends.

Christopher Quinn and Christian Pang continued to insist that Johanna Grider use tax reserves to purchase more marijuana product. Christopher Quinn also micromanaged

the store from his location in Tacoma. Beginning in November 2016, Quinn spied on employees through surveillance cameras. He called the store many times a day to discuss his observations through the cameras, a practice that placed employees on edge. Quinn labeled employees "'incompetent'" and "'idiots.'" CP at 370. Managers under the supervision of Johanna Grider characterized Quinn as a "'classic tyrant'" with "'unrealistic expectations.'" CP at 369. Quinn intended his increasing interference with daily management to harm, if not oust, Grider.

At the unilateral demand of Christopher Quinn, the partnership store, on November 22, 2016, began paying Quinn's past tax debt of $32,469.93 incurred by one of Quinn's other marijuana businesses. The partnership paid $1,200 per month to retire this debt.

In addition to conceding using partnership funds to pay the past debt, Christopher Quinn admitted that he usurped a partnership opportunity for himself. Quinn, Dennis Turner, and Christian Pang started Washington Capital, a business that maintains ATMs. Quinn used the marijuana business partnership funds to fund the startup costs of Washington Capital. Washington Capital gained a fee for every ATM transaction. Washington Capital had four machines, including two in the North Spokane partnership store. Each machine generated $1,000 in revenue every two months. Quinn did not disclose to Johanna Grider his relationship with Washington Capital or reveal that he was an owner of the company that installed the ATM at the partnership store. Quinn did not offer the business opportunity to the partnership.

Also at the autarchic direction of Christopher Quinn, the partnership ended payment to Johanna Grider for the renovation debt. Quinn wanted to recharacterize Grider's debt as her capital contribution to the marijuana partnership.

Johanna Grider lacked income to pay for the interest accruing on the renovation debt since the partnership refused to pay her a salary. Grider only earned $1,675 in 2017. On July 10, 2017, the partnership, at the direction of Dennis Turner, issued a $3,000 partial loan repayment to Grider. When Christopher Quinn learned of the payment, Quinn called Grider, yelled at her, and demanded that she return the money. Grider repaid the funds under duress.

On July 23, 2017, Christopher Quinn, Dennis Turner, and Kevin Williams conducted a meeting of the board of directors of Alkaloid, Inc. During the board meeting, the trio voted to dissolve Lucid North Spokane, LLC with the goal of removing Grider from serving as general manager of the store. Grider learned of the meeting in a July 23 letter from Pang's attorney, Thor Hoyte. Hoyte wrote:

> At the [Board of Directors] meeting, a review of contracts was undertaken. The Lucid North Spokane LLC contract between you, other parties, and Lucid North Spokane LLC was discussed. As you know, Lucid North Spokane LLC is not the license holder, and all those business interests, including those of the members of that LLC, were transferred to Alkaloid, Inc., the license holder. The Board voted to no longer honor Lucid contracts. Therefore, your services as Manager are no longer required.

CP at 206. On July 24, 2017, Dennis Turner posted an e-mail to Johanna Grider that announced her ban from entering the partnership store allegedly "'due to direct threats to

owners and staff.'"  CP at 207.  Grider never consented to the dissolution of Lucid North

Spokane LLC.

Johanna Grider hired legal counsel Maris Baltins.  Baltins sent a demand letter to

Alkaloid attorney, Thor Hoyte, seeking reinstatement of Grider as manager of the Lucid

store, payment of wages owed to Grider, and reimbursement of expenditures incurred by

Grider in preparing the business premises.  The letter also demanded records pertaining to

Grider's termination and relating to corporate and financial information of Alkaloid and

Lucid.  Hoyte and his clients refused to produce the documents.

PROCEDURE

Johanna Grider filed suit on September 29, 2017.  Her complaint alleged nine

causes of action against Christopher Quinn, Christian Pang, Alkaloid, Inc., and Lucid

North Spokane, LLC: (1) breach of contract—failure to repay the loan, (2) breach of

contract—termination of Grider as general manager, (3) breach of fiduciary duty, (4)

breach of implied covenant of good faith and fair dealing, (5) tortious interference with a

contractual relationship or business expectancy, (6) unjust enrichment, (7) recovery of

unpaid compensation, (8) violation of RCW 49.52.050(2), and (9) appointment of a

receiver pursuant to RCW 7.60.025.  Grider did not sue any partnership entity.

In her complaint, Johanna Grider alleged that, under her partnership agreement

with Christopher Quinn and Christian Pang, she should receive a 33 percent ownership

interest in the partnership, be named an owner of the license, and be permitted to manage

the daily operations of the marijuana retail business.  She alleged that Quinn and Pang

17

excluded her from her position as general manager and the business owed her wages. She alleged that her termination as general manager constituted a breach of contract and a violation of the partner fiduciary duties owed by Pang and Quinn.

In her complaint, Johanna Grider alleged that Christopher Quinn and Christian Pang interfered in her contract with the partnership, when the two gentlemen caused the partnership to terminate her employment. Grider alleged that the partnership violated Washington's wage statute, RCW 49.48.010, when terminating her position as general manager. Finally, Grider alleged that the defendants intentionally withheld wages owed, which conduct entitled her to double damages under RCW 49.52.050 and .070.

Johanna Grider listed, in part, as grounds for the appointment of receiver Alkaloid's failure to transfer the i502 license and Pang's and Quinn's termination of her position as general manager of the marijuana retail store. She worried that the conduct of the appellants impaired the income producing potential of the North Spokane store. In addition to seeking an award of damages, Grider requested:

> 5. For appointment of a receiver pursuant to RCW 7.60.025(1); and
> 6. For such other and further relief as the Court deems just and equitable.

CP at 17.

In their answer to the complaint, all defendants raised numerous affirmative defenses. They alleged:

> 8. AS A[N] EIGHTH AFFIRMATIVE DEFENSE and subject to further discovery, Defendants allege as follows: any agreement reached between the parties is contrary to law and public policy and is void and unenforceable.

18

9.  AS AN [sic] NINTH AFFIRMATIVE DEFENSE and subject to further discovery Plaintiffs claimed contract fails for mutual mistake of fact in its formation.

CP at 25.

For eight months, Johanna Grider attempted unsuccessfully to obtain requested discovery from defendants.  Grider filed a motion to compel on May 21, 2018.  The superior court granted the motion and appointed, pursuant to CR 53.3, retired Judge Jerome Leveque as a special master.  Defendants continued to delay in responding to discovery thereafter.  Judge Leveque eventually found the defendants to have engaged in tactical noncompliance with his discovery orders.  Judge Leveque imposed fees of $50 per day until compliance.  An order also granted Grider reasonable attorney fees and costs incurred in bringing and prosecuting her discovery motion.  Through discovery, Johanna Grider learned that Quinn and Pang sought to sell the partnership business and the i502 license without her consent.

On June 7, 2018, Johanna Grider filed a motion to appoint a temporary receiver. The trial court denied the motion based on a stipulation of the defendants that, pending trial, (1) Alkaloid would tender no payments other than those which were reasonable and necessary in the normal course of business, (2) Alkaloid would not pay, directly or indirectly, any compensation to or personal expenses of Christian Pang, any director or shareholder of the corporation, or any entity controlled or owned by them, including Lucid Management LLC, and (3) Alkaloid would issue no shareholder distributions.

In her trial memorandum of authorities, Johanna Grider wrote:

The evidence and the law will show that that resolution of this case hinges upon the original partnership agreement between Ms. Grider, Quinn and Pang and the causes of action arising from the partnership agreement warrant judgment against Quinn and Pang in favor of Ms. Grider.

In summary, the only viable legal entity that still exists is the original partnership formed in April 2016 between Ms. Grider, Quinn and Pang.

Since Pang and Quinn have transferred in whole or in part their partnership interests, Ms. Grider's 33% controls all operations of the partnership.

As part of the requested remedies of the relief sought by Ms. Grider, she respectfully requests that the Court enter an Order confirming her right to manage and control the operations and activities of the partnership, including the marijuana retail operations, on an on-going basis.

CP at 85.

A four day trial began on April 22, 2019. Johanna Grider testified at length as to her understanding of the nature of the partnership, the terms of the partnership agreement, her role at the partnership's North Spokane store, her salary, the renovation loan, the partnership's promise to repay the loan, and her ouster from the business.

During trial, Johanna Grider contended that the parties' relationship was that of partners and the only partners were Christopher Quinn, Christian Pang, and her. She asserted that the partnership owned the i502 license assigned to the N. Newport Highway address. According to Grider, the parties intended the variety of early circulated incomprehensible documents to memorialize the agreement to give her ownership in the i502 license, to pay her a salary as a general manager, and to repay the renovation loan. Later drafted documents, including the operating agreement, sought to exclude Grider from the i502 license and management of the operation in violation of Quinn's and

20

Pang's promises. Grider also asserted that she held, as a result of interest transfers by Pang and Quinn, a majority or controlling share of the partnership.

During trial, Johanna Grider and her accountant testified to wages owed her through the date of trial. Defense counsel attempted to limit the scope of Grider's expert's testimony and opinion. Counsel argued that the complaint only sought wages from November 2016 to July 24, 2017. The superior court disagreed, while explaining that, although causes of action 7 and 8 expressly only sought wages for that time frame, Grider did not limit the temporality of her wage claim under causes of action 2 through 5.

At trial, Christopher Quinn denied the existence of a partnership. He also argued that he held justifiable cause to lock Johanna Grider out of the i502 store. According to Quinn, Grider took partnership money without authorization. He claimed that Grider had lacked approval to receive a salary, so he stopped payment and barred her from the business premises. Quinn, during some of his testimony, denied any knowledge that Grider incurred a debt for renovation costs. According to Quinn, he, Pang, and Turner removed Grider from the business the second time when she sought money to repay the debt. Later, Quinn contradicted himself and declared that he knew about Grider's loan, but averred that the partnership fully repaid the loan. According to Quinn, Grider took $3,000 for repayment of the loan without authorization.

After the conclusion of trial, the superior court found Johanna Grider's testimony more credible than testimony of Christian Pang or Christopher Quinn, and the court adopted Grider's recitation of facts when her testimony conflicted with Pang's and

21

Quinn's versions of events. Documents and other witness testimony confirmed Grider's testimony. The superior court rejected Pang's and Quinn's denial of Grider being appointed manager of the store and that the two never knew the store paid Grider a salary.

The superior court ruled in favor of Johanna Grider on eight causes of action against defendants Christopher Quinn, Christian Pang, and Alkaloid. The court ruled that Johanna Grider, with 33 percent ownership, became the "controlling partner" after Pang and Quinn transferred all or part of their respective partnership interests because the transferees of a partner's interest gain no right to participate in management of the partnership under RCW 25.05.210(1)(c). The superior court concluded that the last cause of action, appointment of a receiver, to be moot presumably because the court ruled Grider to be the controlling partner.

The superior court entered some findings of fact and conclusions of law that addressed the bad faith of Christopher Quinn and Christian Pang. The bad faith included demanding that Johanna Grider use tax reserves for purchase of marijuana, ousting her because of her refusal to use tax reserves, Quinn's micromanagement of the retail business in order to thwart Grider's control, failure to pay wages, failure to repay the loan, flouting agreements with Grider, and mischaracterizing payments to Grider as dividends in violation of Internal Revenue Service rules.

In its conclusions of law, the superior court wrote about Johanna Grider's request for declaratory rulings:

220. **Plaintiff[']s Requests for Declaratory Relief**. Defendants contend that Ms. Grider should not be granted declaratory relief on her claims because she did not use the words declaratory relief or declaratory judgment in her Complaint.

221. Defendants also submit that declaratory relief is a new theory and unfairly prejudicial to them.

222. The Complaint shows Ms. Grider alleged general facts and causes of action.

223. Declaratory relief naturally flows from her successful claims.

224. Moreover, Ms. Grider's Complaint requests "such other and further relief as the Court deems just and equitable."

225. The allegations are sufficient to put the defendants on notice of the potential for equitable and declaratory relief.

226. As previously set forth, the Court concludes that Ms. Grider is a 33% owner of the partnership and she is the controlling partner of the partnership initially established between herself, Mr. Quinn and Mr. Pang in April of 2016.

227. The Court concludes that the i502 license that was wrongfully lodged with Alkaloid, Inc. remains the asset of the partnership between Plaintiff Grider and Defendant Quinn.

228. The Court concludes that Ms. Grider was promised a salaried position as General Manager of the partnership store under the terms of the partnership agreement.

CP at 402-03. The superior court ruled for Grider on her tortious interference cause of action because the interference occurred through the control of Alkaloid, Inc., a third party to the partnership.

The superior court awarded Johanna Grider damages of $171,644.55 for the breach of the promise to repay the loan used to remodel the business premises. The court awarded Grider damages of $178,872.49 for lost wages through March 31, 2019. The court awarded Grider the lost wages also because of the partnership's interference in a business expectancy. The amount of past due wages owed was $69,575. Because of Christopher Quinn's intentional refusal to pay the wages, the superior court doubled this

amount to $139,150 against Quinn only. The superior court entered judgment against Christopher Quinn in the sum of $437,592.04. The court entered judgment against Christian Pang for $368,017.04 and against Alkaloid, Inc. for $350,517.04. The court entered no judgment against Lucid North Spokane, LLC.

The superior court awarded Johanna Grider reasonable attorney fees in the amount of $244,437.50 and reasonable and necessary costs in the amount of $24,509.35 against Christian Pang, Christopher Quinn, and Alkaloid. The court based the award of fees on the partnership agreement, the equitable exception to the American rule of attorney fees, and wage statutes. In support of the award of fees and costs, the court entered additional findings of fact and conclusions of law.

## LAW AND ANALYSIS

On appeal, appellants Christian Pang, Christopher Quinn, and Alkaloid assign error to the following rulings of the superior court: (1) the granting of declaratory relief, (2) declaring the i502 license an asset of the partnership, (3) declaring Grider to be the controlling partner, (4) granting Grider judgment on her claim for tortious interference, (5) assessing the amount of damages and (6) awarding reasonable attorney fees.

### Declaratory Relief

Appellants challenge the granting to Johanna Grider of declaratory relief because she did not seek declaratory relief in her complaint and, contrary to the trial court's findings, declaratory relief did not flow naturally from her successful claims. According

24

to appellants, if Grider desired declaratory relief, she needed to expressly plead it in her complaint.

We find no Washington statute or reported decision, foreign or domestic, that directly addresses the assignment of error. Based on an accumulation of factors, we reject appellants' argument. The complaint adequately warned appellants that Johanna Grider sought rulings that the marijuana license was an asset of the partnership and that she should manage the retail store. The need to issue declaratory rulings naturally followed from the causes of action asserted by Grider. Appellants' affirmative defenses also required the court to decide ownership of the i502 license and the marijuana store and management of the store. Grider gave appellants notice in her trial brief that she sought declaratory relief. The parties litigated, during trial, the ownership interest in the partnership and control of the partnership business such that this court may conform the pleadings to include claims by Grider for declaratory relief under CR 15(b). The superior court granted Grider declaratory relief in place of her more costly request for the appointment of a receiver.

We recognize the principle, on which appellants rely, that a court lacks authority to grant relief beyond that sought in the complaint. *In re Marriage of Leslie*, 112 Wn.2d 612, 617, 772 P.2d 1013 (1989); *School Districts' Alliance for Adequate Funding of Special Education v. State*, 149 Wn. App. 241, 261, 202 P.3d 990 (2009), *aff'd* 170 Wn.2d 599, 244 P.3d 1 (2010). Nevertheless, no statute demands or case holds that the claimant may not obtain declaratory relief without an express request in the complaint.

25

In a declaratory action, the ordinary rules of pleading apply. *Smith v. Bitter*, 319 N.W.2d 196, 201 (Iowa 1982). The same liberal pleading standards applied in other civil actions also govern declaratory actions. *Stew-Mc Development, Inc. v. Fischer*, 770 N.W.2d 839, 848 (Iowa 2009). As in any other action, an issue may be directly, or impliedly, raised by the pleadings. *Stew-Mc Development, Inc. v. Fischer*, 770 N.W.2d 839, 848 (Iowa 2009).

The appellants cite *School Districts' Alliance for Adequate Funding of Special Education v. State*, 149 Wn. App. 241 (2009) as support for their contention that Johanna Grider needed to expressly seek declaratory relief in her complaint. This court, in *School Districts' Alliance*, denied review of the plaintiffs' challenge to the adequacy of the basic education act, because the plaintiffs had only sought, in their complaint, relief as to the constitutionality of the special education funding scheme. This court based its decision on the plaintiffs' failure to plead the substance of its challenge, rather than failing to expressly seek declaratory relief.

In her prayers for relief, Johanna Grider requested "other and further relief as the Court deems just and equitable." CP at 17. In *Fred Ahlert Music Corp. v. Warner/Chappell Music, Inc.*, 155 F.3d 17, 21 (2d Cir. 1998), the claimant, in addition to requesting declaratory relief, asked the federal district court to "grant[ ] such other and further relief as the court may deem to be just and proper." As a result, the district court awarded the plaintiff monetary damages in addition to declaratory relief, despite the plaintiff failing to expressly ask for a monetary award. The converse should also hold

26

true. A plaintiff who expressly prays for damages should also recover declaratory relief, when the facts warrant this additional relief and when the claimant includes in the complaint a request for other and further relief as is just and equitable.

In business litigation, wherein a party seeks monetary relief, the court often must determine the rights of the parties in reference to business agreements. Declarations of rights run with the suit regardless of whether the complaint specifically asks for declaratory relief.

In her trial memorandum submitted two weeks before trial, Johanna Grider penned that the trial court should confirm her right to manage and control the operations of the store. Appellants knew then, and probably earlier, that Grider wanted some form of declaratory relief and never objected during trial to such relief.

In *State v. Adams*, 107 Wn.2d 611, 732 P.2d 149 (1987), our Supreme Court affirmed a monetary judgment as relief despite the fact that the original pleadings did not specifically seek a money judgment. The high court reasoned that a summary judgment brief warned the defendant that the State sought such alternative relief.

Johanna Grider listed, in part, as grounds for the appointment of receiver Alkaloid's failure to transfer the i502 license and the termination of her employment as general manager of the marijuana retail store. In order to address the request for a receivership, the trial court needed to resolve who owned the recreational marijuana retail license and whether Quinn was promised the general managership. Under Washington's receivership statute, the receiver through the court's authority, holds exclusive control

27

and possession of all assets of the ongoing enterprise. RCW 7.60.055, .060. Any person holding property of the business, which would include the i502 license, must surrender the property to the receiver. RCW 7.60.070. Although the court could not appoint Johanna Grider as the receiver, the court saved the parties the expense of a receiver by declaring Grider to control the operations of the North Spokane outlet and ruling the marijuana license to be an asset of the partnership business.

Appellants contend the trial court compounded its error in granting declaratory relief because Johanna Grider did not join Dennis Turner and Kevin Williams as parties despite their status as shareholders of Alkaloid. According to appellants, Turner and Williams owned a portion of the i502 license. We disagree. Shareholders of a corporation do not own corporate assets. The joinder of the corporation to the suit sufficed.

Finally, CR 15(b) also allows this court to affirm the trial court's declaratory rulings. According to CR 15(b), when the parties try issues not raised by the pleadings, the court shall treat those issues as if raised in the pleadings. CR 15(b). The failure to formally amend the pleadings "does not affect the result of the trial of these issues." CR 15(b); *Green v. Hooper*, 149 Wn. App. 627, 636, 205 P.3d 134 (2009). Although the trial court did not rely on this civil rule, this reviewing court may affirm on any ground within the proof. *State v. Rohrich*, 149 Wn.2d 647, 654, 71 P.3d 638 (2003).

Controlling Partner

We move to the substance of the appeal. Appellants contend the trial court erred when declaring Johanna Grider to be the controlling partner of the North Spokane retail marijuana business. They assert that the law does not recognize a "controlling partner." They further argue that the ruling violates the parties' partnership agreement and Washington's partnership act that requires a majority vote of partners on partnership decisions. We agree.

The trial court declared Johanna Grider to be the controlling partner of Lucid North Spokane as of July 14, 2016. The trial court pegged its ruling on the transfer of partnership interests by Christian Pang and Christopher Quinn to third parties. The superior court reasoned that the transferees of the partnership interests gained no management interests in the partnership, but Pang's management interest decreased to zero percent and Quinn's management interest waned to five percent. Therefore, according to the court, Grider's holding of a thirty-three percent management interest effectively placed her in control of partnership affairs.

Appellants contend that, even after transferring their interests, Christopher Quinn and Christian Pang, under RCW 25.05.210(4), retained the rights and duties of a partner other than the interest in profits and losses of the partnership. Additionally, business decisions must be resolved by a majority or unanimous vote of all partners, not resolved by the partner or partners with a majority interest in the partnership. Once again, we agree.

29

The Washington Revised Uniform Partnership Act, chapter 25.05 RCW, adopted by Washington State, nowhere mentions a "controlling partner." Instead, RCW 2.05.150(6) declares:

> Each partner has equal rights in the management and conduct of the partnership business.

Thus, unless the partners agree otherwise, each partner, no matter the percentage of ownership interest, receives an equal vote in management affairs.

Christian Pang's and Christopher Quinn's transfer of shares did not reduce either's voting strength. If a partner transfers his shares, the transferee gains no management interest in the partnership. The transferor retains that interest. RCW 25.05.210 declares:

> (1) A transfer, in whole or in part, of a partner's transferable interest in the partnership:
> (a) Is permissible;
> (b) Does not by itself cause the partner's dissociation or a dissolution and winding up of the partnership business; and
> (c) Does not, as against the other partners or the partnership, entitle the transferee, during the continuance of the partnership, to participate in the management or conduct of the partnership business. . . .
> (2) A transferee of a partner's transferable interest in the partnership has a right:
> (a) To receive, in accordance with the transfer, allocations of profits and losses of the partnership and distributions to which the transferor would otherwise be entitled;
> . . . .
> (4) Upon transfer, the transferor retains the rights and duties of a partner other than the interest in profits and losses of the partnership and distributions transferred.

Christopher Quinn and Christian Pang could lose their right to equal management of the partnership if dissociated from the partnership. RCW 25.05.235(2)(a). A partner may expel another partner because of a transfer of most of his interest or because of

misconduct. RCW 25.05.225. JoHanna Grider never sought to dissociate Quinn and

Pang from the partnership.

JoHanna Grider recognizes that, if we apply RCW 26.05.150(6), she would not be

the controlling partner. She contends that the statute does not apply in this dispute

because the statute applies only in default of the parties' failing to address the subject or

question in the partnership agreement. We agree that RCW 25.05.015 reads that the

partnership agreement, rather than partnership statutes, controls the partner's relationship

except in limited circumstances not relevant here. We disagree that the partnership

agreement allocates Grider a controlling share. Grider identifies no provision in any

agreement that references a controlling partner or how one becomes the controlling

partner.

Johanna Grider writes that, in conclusion of law 6, the trial court interpreted the

partnership agreement as modifying RCW 25.05.150(6) such that "each partner held a

partnership interest under RCW 25.05.005(9) commensurate with their respective

ownership interests in the i502 license." Am. Br. Resp't at 22. The conclusion of law

does not so read, however. The conclusion of law states:

> 6. The partnership interests held by each include not only their
> respective ownership interests in the i502 license, but also each "partner's
> transferable interest and all management and other rights." RCW
> 25.05.005(9).

CP at 287. The conclusion of law references the fact that each partner's interest was

transferable, and that each partner held management and other rights. More importantly,

the conclusion of law does not conclude that, when rendering partnership decision, one

31

partner's vote is weighted by his or her partnership interest or that, if one partner has more than a fifty percent share of the license of the partnership interests, that partner becomes the controlling partner.

Johanna Grider next writes that, while the subsequent transfers of part or all of Christopher Quinn's and Christian Pang's respective interests did not result in dissociation of either Quinn or Pang, the transfers reduced the duo's management rights. We agree that the trial court's ruling implies such a conclusion, but Grider has not presented any facts that the partnership agreement reduced one of the three original partner's management on a transfer of all or a part of his or her interest. As already seen, RCW 25.05.210(4) declares that, on transfer of all or part of his partnership interest, the transferor retains the rights and duties of a partner other than the interest in profits and losses of the partnership.

Johanna Grider next writes:

> Indeed, no witness who testified at trial contradicted the fact management authority in the partnership was treated as coextensive with each partner's partnership interest with Pang at 37%.; Ms. Grider at 33%; and Quinn at 30%. The partners acted accordingly.

Am. Br. Resp't at 23. Whereas the first sentence is true, Grider cites to no part of the trial record wherein a witness testified that a partner's management authority was treated as coextensive with each partner's partnership interest. Grider also provides no factual support for the conclusion that the partners acted accordingly.

Johanna Grider writes:

32

In Alkaloid, Inc., management rights of shareholders would be based upon their stock percentage ownership. Ex P-11. Similarly, in Lucid North Spokane, LLC, voting rights would have been based upon the members' respective ownership units in the company. Ex P-6.

Am. Br. Resp'tat 24. Exhibit P-11 is a July 21, 2017 State of Washington Business Licensing Service completed form entitled "Change in Governing People, Percentage Owned and/or Stock/Unit Ownership." The document reads that the ownership of Alkaloid, Inc. is now 33 percent for Johanna Grider, 37 percent for Dennis Turner, 25 percent for Christopher Quinn, and 5 percent for Kenneth Williams. The form does not mention that voting or management rights correlates to one's ownership percentage.

Exhibit P-6 is the limited liability company agreement for Lucid North Spokane, LLC. The agreement lists the percentage interests in JoHanna Grider, Dennis Turner, Christopher Quinn, and Kevin Williams in the limited liability company, but does not read that voting strength matches the ownership interest. Instead, one article of the agreement grants Dennis Turner and Christopher Quinn joint management and control of the company. According to the agreement, certain actions cannot take place without a 67 percent vote of the ownership interests in the limited liability company, including the removal of the manager.

Johanna Grider cites *Rhoads v. Jones Financial Companies*, 957 F. Supp. 1102, 1105 (E.D. Mo. 1997), for the proposition that the partnership agreement can allocate voting power to be equal to a partner's percentage in the partnership. But there the written partnership agreement expressly stated such. Grider cites *Singleton v. Fuller*, 118 Cal. App. 2d 733, 741, 259 P.2d 687 (1953) for the rule that the partnership agreement

may give the duty of management of the enterprise or any part thereof to one partner. Assuming such an agreement, the agreement appointed Dennis Turner and Christopher Quinn. The parties agreed that Grider would manage the store, but not control the partnership.

Finally, Johanna Grider references *J&J Celcom v. AT&T Wireless Services, Inc.*, 162 Wn.2d 102, 169 P.3d 823 (2007) as employing the term "controlling partner." In fact, the Washington Supreme Court used the word "controlling partner" in its decision, but in a lay sense and not for the purpose of attaching a legal meaning to the term. The complaining partners owned a five percent interest in the partnership, while the defending partner owned the remaining ninety-five percent of the business. The court reviewed a partnership agreement that allowed the sale of partnership assets on a supermajority vote. The decision did not mention whether the partnership agreement based voting strength on the basis of ownership interest or if each partner was entitled to an equal vote.

The superior court denied appointment of a receivership because nominating Johanna Grider as the controlling partner mooted the need for a receiver. Because we reverse the trial court's appointment of Grider as controlling partner, we remand to the superior court to determine whether to appoint a receiver.

Wrongful Termination from Employment

Appellants contend, based on procedural and substantive grounds, that the trial court erred when ruling that the partnership wrongfully terminated Johanna Grider from employment. We address the procedural reason first. Appellants argue that Grider never

34

pled a cause of action for wrongful termination. According to appellants, the trial court

erroneously permitted Grider to assert this new theory during the middle of trial.

In their reply brief, the appellants announce that they do not challenge the superior

court's grant of wages through July 2017, which they reference as past wages owed.

They only contend the court should not have granted wages beyond that month.

Therefore, we only address a claim for future wages. The trial court awarded wages for

the time period August 1, 2017, the date of filing suit, until May 31, 2019, the date of the

court's decision. The decision returned Johanna Grider to management of the business

such that she could direct the partnership to pay her the promised wages.

Johanna Grider responds that her complaint adequately placed appellants on notice

that she sought both past and future wages from the date of termination. We agree with

Grider.

Washington courts require a party to give proper notice of a claim to opposing

parties in its pleadings through a "short and plain statement of the claim showing that the

pleader is entitled to relief." CR 8(a). Courts must liberally construe pleadings. *State v.

Adams*, 107 Wn.2d 611, 620 (1987). Rules of pleadings serve a purpose to facilitate a

proper decision on the merits, not to erect formal and burdensome impediments to the

litigation process. *State v. Adams*, 107 Wn.2d at 620. If the "complaint states facts

entitling the plaintiff to some relief, it is immaterial by what name the action is called."

*State v. Adams*, 107 Wn.2d at 620. Courts construe pleadings to do substantial

justice, and even if a claim is not a vision of precise pleading or is mislabeled, it may still

give the notice CR 8 requires. *Burnet v. Spokane Ambulance*, 131 Wn.2d 484, 492, 933

P.2d 1036 (1997). Parties may clarify initial pleadings in the course of later pleadings.

*Puget Sound Security Patrol, Inc. v. Bates*, 197 Wn. App. 461, 474, 389 P.3d 709 (2017).

The complaint of Johanna Grider contained numerous allegations that a contract or

promise of employment existed and the partnership violated that agreement. Grider

alleged that a purpose of the partnership was to operate a marijuana retail outlet that

Grider would manage. In return to her finding a location and opening the store, the

partnership agreed that Grider would manage the day to day operations of the partnership

store. Pursuant to the partnership agreement, Grider assumed the general manager

position at a salary of $7,500 per month. According to the complaint, in November 2016,

Christopher Quinn attempted to terminate Grider for her position as general manager. On

November 14, 2016, the partners entered into a document entitled Roles and

Responsibilities that confirmed Grider would serve as manager of the store operations.

On July 24, 2017, based on false charges, the partnership terminated Grider from her

position as general manger. From November 2016 to July 2017, the partnership failed to

pay Grider's salary. Grider contended that the partnership owed her $67,500 for these

nine months.

Johanna Grider further alleged in her complaint that the partnership agreement

required her employment as general manager of the daily operations. Her termination

from employment breached the contract. Grider alleged that, as her partners, Christopher

Quinn and Christian Pang breached their fiduciary duties when causing the partnership to

36

terminate her from employment. She alleged that the partnership, Quinn, and Pang violated an implied duty of good faith when terminating her as general manager of the business. Grider alleged that Pang and Quinn interfered in her contract with the partnership, when the two gentlemen caused the partnership to terminate her employment. Grider alleged that the partnership violated Washington's wage statute, RCW 49.48.010, when terminating her position as general manager. Finally, Grider alleged that the appellants intentionally withheld wages owed, which conduct entitled her to double damages under RCW 49.52.050, .070. The complaint more than adequately warned appellants of a cause of action for wrongful termination from employment.

Appellants also contend that Johanna Grider did not plead any damages for wrongful termination from employment beyond July 2017. We disagree. In one paragraph in her complaint, Grider alleged that the partnership owed her $67,500 for wages due from November 2016 to July 2017, the date of her wrongful exclusion of the partnership business. Nevertheless, Grider did not limit her claim for damages to July 2017. Later she alleged a breach of contract resulting from her termination from employment and asked for an unspecified and unlimited amount of damages in an amount to be proved at trial. If the appellants had any confusion as to the amount sought by Grider, they could have explored this subject in discovery. Under her cause of action for failure to pay wages, Grider asserted no limitation on the amount.

Even if we found the claim for future wages insufficiently pled in the complaint, the record demonstrates that the parties litigated the issue at trial. In determining whether

the parties impliedly tried an issue, this court examines the record as a whole, the evidence on the issue admitted at trial, and the legal and factual support for the trial court's conclusions regarding the issue. *Karlberg v. Otten*, 167 Wn. App. 522, 530-31, 280 P.3d 1123 (2012). Absent a showing of surprise or prejudice, the trial court holds discretion, on perceiving issues or claims arising other than as pled, to redefine issues under CR 15(b). *Harding v. Will*, 81 Wn.2d 132, 137-38, 500 P.2d 91 (1972).

The parties extensively litigated Johanna Grider's claim for wages. Appellants' counsel attempted to limit the scope of Grider's expert's opinions, while arguing that the complaint only sought wages from November 2016 through July 24, 2017. The trial court disagreed because many of the causes of action placed no temporal restriction on the claim for wages.

Because we rule that Johanna Grider sufficiently pled a wrongful termination claim, we proceed to the question of whether sufficient evidence sustains the trial court's ruling in favor of Grider on this claim. When forwarding a claim for wrongful firing from employment, Grider actually asserted several causes of action: (1) breach of contract; (2) breach of implied duty of good faith; (3) breach of a partner's fiduciary duty; (4) recovery of unpaid wages under a Washington statute; and (5) violation of Washington's intentional withholding of wages statute. We may affirm the superior court on any of the grounds.

As to the substance of the claim for future wages, appellants continually refer to Johanna Grider's employment as being in the nature of at-will employment.

38

Nevertheless, the overwhelming evidence supported a finding that Christian Pang promised Johanna Grider salaried employment at the marijuana retail store and that Pang had authority to issue this promise. In turn, the partnership did not hire Grider as an at-will employee.

The appellants assign error to none of the findings of fact. Those findings became verities on appeal. *State v. O'Neill*, 148 Wn.2d 564, 571, 62 P.3d 489 (2003). The trial court found that Pang bargained on behalf of Quinn, himself, and the partnership that Grider would hold a salaried position as general manager of the North Spokane recreational use marijuana store. Pang approved Grider's monthly salary of $7,500 on behalf of Mr. Quinn and the partnership. The superior court also found that the appellants breached the contract by revoking Grider's salary and prohibiting her from continuing her position at the i502 store causing her damage including lost wages. But for appellants' breach, Grider would have continued to work at the i502 store and earned $7,500 each month.

The superior court did not commit error when awarding wages to the date of trial. For breach of contract, the injured party may recover all damages naturally accruing from the breach and be put in as good a position as she would have been in had the contract been performed. *Northwest Land & Investment, Inc. v. New West Federal Savings & Loan Association*, 57 Wn. App. 32, 43, 786 P.2d 324 (1990).

Johanna Grider testified that she worked at the time of trial. Nevertheless, the appellants cite to no testimony or exhibits that relate the amount earned by Grider during

this employment. Therefore, we do not conclude that the superior court erred by failing to deduct her earnings from the award of lost wages.

Tortious Interference of a Business Expectancy

Christopher Quinn and Christian Pang object, on two grounds, to the superior court's ruling that they tortiously interfered with Johanna Grider's employment with the partnership. First, Grider held at-will employment. Second, Grider failed to show that the interferor was an intermeddling third party, one of the elements of a tortious interference claim. We already affirmed the superior court's ruling that the employment agreement was not at-will employment, so we do not address the appellants' first contention. We agree with appellants' second argument.

A claim for wrongful interference with a business relationship requires five elements: (1) a valid contractual relationship or business expectancy, (2) knowledge of that relationship by the defendants, (3) intentional interference by the defendants inducing or causing a breach or termination of the relationship or expectancy, (4) interference by the defendants based on an improper purpose or improper means, and (5) damages. *Sintra, Inc. v. City of Seattle*, 119 Wn.2d 1, 28, 829 P.2d 765 (1992), *abrogated on other grounds, Yim v. City of Seattle*, 194 Wn.2d 682, 451 P.3d 694 (2019); *Citoli v. City of Seattle*, 115 Wn. App. 459, 486, 61 P.3d 1165 (2002). In addition, the plaintiff must show that the interferor was an intermeddling third party; a party to the relationship cannot be held liable for tortious interference. *Houser v. City of Redmond*, 91 Wn.2d 36, 39, 586 P.2d 482 (1978); *Calbom v. Knudtzon*, 65 Wn.2d 157,

162, 396 P.2d 148 (1964); *Vasquez v. Department of Social & Health Services*, 94 Wn.

App. 976, 989, 974 P.2d 348 (1999).

We base our ruling on a principle related to the rule requiring the defendant to be

an intermeddler. The tort of interference with economic relations developed to fill an

interstitial void in remedial jurisprudence. *Ryan v. Brooklyn Eye & Ear Hospital*, 46

A.D.2d 87, 90, 360 N.Y.S.2d 912 (App. Div. 1974). Courts did not intend the tort to act

as a substitute for an already existing cause of action. *Ryan v. Brooklyn Eye & Ear

Hospital*, 46 A.D.2d at 90. If one has an action for breach of contract, she does not also

have a cause of action for inducement to breach against the same defendant. *Ryan v.

Brooklyn Eye & Ear Hospital*, 46 A.D.2d at 90. More succinctly, one cannot be guilty of

inducing the breach of his or its own contract. *Olympic Fish Products, Inc. v. Lloyd*, 93

Wn.2d 596, 598, 611 P.2d 737 (1980); *Reninger v. Department of Corrections*, 134

Wn.2d 437, 448, 951 P.2d 782 (1998).

The superior court granted judgment against Christopher Quinn and Christian

Pang for breach of the partnership contract. Although the ruling did not harm the two

because Johanna Grider cannot recover her damages twice, the court should not have

entered an additional judgment against the two for tortious interference. Alkaloid may

have been an intermeddler to the partnership agreement, but the superior court entered

judgment against it also for damages suffered for the breach of contract.

Damages Related to Remodel Loan

The superior court ruled that the appellants breached a promise to pay to Johanna Grider the amount of the $115,000 loan she incurred for purposes of remodeling the North Spokane business premises. Nevertheless, although Grider received loans for this sum, she only forwarded $90,273.37 of the amount to the partnership. The undisputed evidence confirms this figure, and Grider does not argue in her brief to the contrary. Therefore, we agree with appellants that the trial court should reduce the judgment on the loan cost for this amount by $24,726.63.

The partnership paid Johanna Grider $57,500 between November 2016 and June 2017. Appellants contend they tendered this money in order to partially retire the loan Grider received. Nevertheless, appellants presented no documentation that identified the respective payments as retirement of the loan. Appellants' accountant had asked Christopher Quinn and Christian Pang to identify the nature of the payments. Neither advised that the amount repaid the loan.

This court reviews a trial court's findings of fact and conclusions of law to determine whether substantial evidence supports the findings and, if so, whether the findings support the trial court's conclusions of law. *Scott v. Trans-System, Inc.*, 148 Wn.2d 701, 707-08, 64 P.3d 1 (2003). Substantial evidence is the "quantum of evidence sufficient to persuade a rational fair-minded person the premise is true." *Sunnyside Valley Irrigation District v. Dickie*, 149 Wn.2d 873, 879, 73 P.3d 369 (2003). Unchallenged findings of fact are verities on appeal. *Merriman v. Cokeley*, 168 Wn.2d

627, 631, 230 P.3d 162 (2010). And, an unchallenged conclusion of law becomes the law of the case. *Nguyen v. City of Seattle*, 179 Wn. App. 155, 163, 317 P.3d 518 (2014). Appellate courts defer to the trial court on issues of conflicting evidence, witness credibility, and persuasiveness of the evidence. *City of University Place v. McGuire*, 144 Wn.2d 640, 652-53, 30 P.3d 453 (2001). The superior court did not err when characterizing the payment of $57,500 as wages.

Assuming appellants argue that Johanna Grider cannot recover interest paid on the loan, we disagree. Appellants cite no law in support of such an argument. The plaintiff may recover for breach of contract all damages naturally accruing from the breach, and to be put in as good a position as she would have been in had the contract been performed. *Northwest Land & Investment, Inc. v. New West Federal Savings & Loan Association*, 57 Wn. App. 32, 43 (1990). Nevertheless, the trial court, with probable assistance from an accountant, must recalculate the interest accrued by Grider on the loan only to the extent she forwarded $90,273.37 to the partnership and with the principal periodically being retired because of the partnership repayments to Grider.

Double Damages

Christopher Quinn contends the trial court erred when awarding Johanna Grider double the amount of wages owed through November 2017. He argues that, under the controlling statute, RCW 49.52.050, the worker may not recover double damages unless the worker falls within the definition of an "employee" and this definition does not include executives. According to Quinn, we should consider Grider, as the general

43

manager of the marijuana retails store and as part owner of the partnership, to be an executive.

Johanna Grider responds that Christopher Quinn did not argue at trial that she lacked the qualifications of an "employee" for purposes of the exemplary damages. Thus, she asks us to deny review of Quinn's argument.

In his appeal brief, Christopher Quinn references CP 323-24 for his motion for reconsideration. We find the motion at CP 323-24. Nevertheless, the motion for reconsideration does not indicate that the appellants sought reconsideration of the grant of double damages because of Johanna Grider being an executive. The motion refers to a memorandum of authorities. Nevertheless, in their appellate brief, the appellants do not identify where, in our records, any memorandum lies. An appellate court will not search through the record for evidence relevant to a litigant's arguments. *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 819, 828 P.2d 549 (1992); *Mills v. Park*, 67 Wn.2d 717, 721, 409 P.2d 646 (1966).

We proceed as if Christopher Quinn did not raise the executive theory before the trial court. A party is precluded from raising an issue on appeal not first raised at trial. RAP 2.5(a); *Wilcox v. Basehore*, 187 Wn.2d 772, 788, 389 P.3d 531 (2017).

Attorney Fees

Appellants assign error to the superior court's grant of reasonable attorney fees and costs in favor of Johanna Grider. The trial court awarded fees under two statutes, because of a breach of the partnership agreement, and because of the breach of fiduciary

duties as partners. Appellants contend that none of these exceptions, to the American rule that each party pays his or her fees, justify the award.

*1. Statutes*

Johanna Grider contends that RCW 49.48.030 and RCW 49.52.070, two wage statutes, afford a successful employee reasonable attorney fees. In turn, appellants contend the wage statutes do not apply because the statutes only apply to employees and Grider, as an owner and manager of the marijuana business, was not an "employee." In reply, Grider answers that appellants never objected to an award of fees on the basis that she was an executive, not an employee.

RCW 49.48.030 declares:

> In any action in which *any person* is successful in recovering judgment for wages or salary owed to him or her, reasonable attorney's fees, in an amount to be determined by the court, shall be assessed against said employer or former employer.

(Emphasis added.) This statute does not limit itself to employees.

RCW 49.52.070 reads:

> Any employer and any officer, vice principal or agent of any employer who shall violate any of the provisions of RCW 49.52.050 (1) and (2) shall be liable in a civil action by *the aggrieved employee* or his or her assignee to judgment for twice the amount of the wages unlawfully rebated or withheld by way of exemplary damages, together with costs of suit and a reasonable sum for attorney's fees: PROVIDED, HOWEVER, That the benefits of this section shall not be available to any employee who has knowingly submitted to such violations.

(Emphasis added.) This statute employs the word "employee." In turn RCW 49.52.050(2) referenced in RCW 49.52.070 provides:

45

> Any employer or officer, vice principal or agent of any employer, whether said employer be in private business or an elected public official, who
>
> . . . .
>
> (2) Wilfully and with intent to deprive *the employee* of any part of his or her wages, shall pay any employee a lower wage than the wage such employer is obligated to pay such employee by any statute, ordinance, or contract; or
>
> . . . .
>
> Shall be guilty of a misdemeanor.

(Emphasis added.)

We conclude that the superior court may award anyone recovering wages, under RCW 49.48.030, attorney fees regardless of whether this person fits any definition of "employee." In so ruling, we rely on two principal principles of statutory construction. First, we give statutory words their plain and ordinary meaning unless a different meaning is specified. *Erection Co. v. Department of Labor & Industries*, 121 Wn.2d 513, 518, 852 P.2d 288 (1993). Thus, "any person" within RCW 49.48.030, means any person.

Second, when the legislature uses different words within the same statute, we recognize that a different meaning is intended for each word. *Columbia Riverkeeper v. Port of Vancouver USA*, 188 Wn.2d 421, 439, 395 P.3d 1031 (2017). We consider this principle applicable also when the legislature employs two different words in separate statutes. If the Washington legislature had wanted attorney fees to be limited to "employees" under RCW 49.48.030, the legislature would have used that term.

Appellants also reference WAC 296-126-002, which excludes from the definition of "employee" any individual employed in an executive capacity. They further cite WAC

46

296-128-510(2), which reads that an "executive" includes anyone "[w]ho owns at least a bona fide twenty percent equity interest in the enterprise in which the employee is employed . . . and who is actively engaged in its management." But nothing ties these regulations to RCW 49.48.030. WAC 296-126 blankets work safety and inadequate wages. WAC 296-128 covers minimum wages, not unpaid wages.

We conclude that Johanna Grider may recover reasonable attorney fees incurred for recovering her wages due. Because we affirm the ruling granting reasonable attorney fees incurred in recovering wages, we do not address Grider's argument that appellants could not raise her purported executive role as a defense.

### 2. Breach of Fiduciary Duties

Johanna Grider also contends that the superior court correctly granted her attorney fees because Christopher Quinn and Christian Pang breached fiduciary duties owed her as partners and for other misconduct. Appellants respond that Washington law does not authorize an attorney fee award whenever a partner breaches a fiduciary duty of loyalty.

Appellants also contend that Johanna Grider never sought an award of attorney fees in her complaint based on breaches of fiduciary duty. Therefore, the court should not have awarded fees. Additionally, Ms. Grider failed to provide notice she was seeking fees based on a breach of fiduciary duty because she did not raise that theory until after trial. For the same reasons that we hold that Grider adequately pled the request for declaratory relief, we rule that Grider adequately pled a request for reasonable attorney fees because of the appellants' misconduct.

47

Under the American rule of attorney fees, Washington courts consistently refuse to award attorney fees as part of the cost of litigation in absence of a contract, statute, or recognized ground of equity. *Public Utility District No. 1 of Snohomish County v. Kottsick*, 86 Wn.2d 388, 389, 545 P.2d 1 (1976). In *Public Utility District No. 1 of Snohomish County v. Kottsick*, the Supreme Court catalogued four equitable grounds for an award of fees: bad faith conduct of the losing party, preservation of a common fund, protection of constitutional principles, and private attorney general actions. Johanna Grider contends that bad faith and preservation of a common fund both apply to her request. We rely only on the bad faith equitable exception.

In *State ex rel. Macri v. City of Bremerton*, 8 Wn.2d 93, 111 P.2d 612 (1941), the Washington Supreme Court first indicated that fees might be awarded depending on the justice of the cause or the facts and circumstances of the particular case. Subsequently, the state high court relied on this language for the proposition that fees could be awarded if the prevailing party proved the opposing party acted with bad faith or wantonness. *Clark v. Washington Horse Racing Commission*, 106 Wn.2d 84, 93, 720 P.2d 831, 836 (1986); *ASARCO, Inc. v. Air Quality Coalition*, 92 Wn.2d 685, 716, 601 P.2d 501 (1979); *Hsu Ying Li v. Tang*, 87 Wn.2d 796, 798, 557 P.2d 342 (1976); *Public Utility District No. 1 of Snohomish County v. Kottsick*, 86 Wn.2d 388, 390 (1976). One Washington court used the term "oppressive behavior" in place of "bad faith conduct" as the basis for an equitable award. *Snyder v. Tompkins*, 20 Wn. App. 167, 174, 579 P.2d 994 (1978).

48

Washington courts have applied the equitable exception in partnership settings. Breach of partnership fiduciary duty is an equitable ground. *Simpson v. Thorslund*, 151 Wn. App. 276, 288, 211 P.3d 469 (2009). A partner should share the expense of a lawsuit when he breaches his fiduciary duty to the other partners. *Hsu Ying Li v. Tang*, 87 Wn.2d 796, 801 (1976). The trial court holds discretion whether to afford a successful plaintiff reasonable attorney fees when she proves her partner violated a fiduciary duty. *Green v. McAllister*, 103 Wn. App. 452, 468, 14 P.3d 795 (2000); *Guntle v. Barnett*, 73 Wn. App. 825, 836, 871 P.2d 627 (1994).

In *Hsu Ying Li v. Tang*, 87 Wn.2d 796 (1976), the Washington Supreme Court affirmed an award of attorney fees in favor of one partner against another partner. The defendant partner assumed control of the partnership, but kept no records of the names of the tenants nor the amount of rentals collected, and deposited the partnership funds in the same bank account in which he held his personal funds. Out of this same bank account he disbursed the partnership expenses and his personal expenses. When the plaintiff partner requested an accounting, the defendant failed to produce one. The court noted that defendant had breached his fiduciary duty to petitioner. Partners must exercise the utmost good faith toward each other. The breach of the fiduciary duty constituted constructive fraud.

In *Green v. McAllister*, 103 Wn. App. 452 (2000), Harry Green appealed the trial court's denial of attorney fees based on the court's conclusion of law that reliance on advice of counsel was an excuse for the breach of a fiduciary duty. This court first ruled

that a partner could not avoid liability for a breach by relying on counsel's advice. Thereafter, this court ruled that a fiduciary's breach does not mandate an award of fees. Instead, the superior court holds discretion whether to award fees. Because the superior court failed to exercise its discretion, this court remanded to the superior court to exercise its choice. The defendant partners had secretly engaged an appraiser to value the partnership land, paid for his services with partnership funds, did not inform Green of the result, secretly transferred the asset, and forced Green out of the partnership by means of a capital call.

In this appeal, the superior court ruled that Christopher Quinn and Christian Pang repeatedly violated their duties of loyalty to an extent equal or exceeding the conduct of partners in *Green v. McAllister*. We agree. Findings and conclusions supporting this ruling are attached. Thus, the superior court did not abuse its discretion.

Appellants contend that later Washington courts distanced themselves from the rulings in *Hsu Ying Li v. Tang* and *Green v. McAllister* or even overturned those rulings. Appellants also contend that the courts issued haphazard rulings in *Hsu Ying Li v. Tang* and *Green v. McAllister*. Finally, appellants maintain that the rulings lack relevance to the circumstances on appeal. We agree that the courts did not fully analyze the issue of attorney fees or adequately explain why and when fees may be available in a partnership setting. Nevertheless, later courts have never overruled the decisions. More importantly, the conduct of appellants Christopher Quinn and Christian Pang was egregiously

50

oppressive even outside the context of the fiduciary duties of a partner. Also, the partnership already paid the attorney fees incurred by Quinn and Pang in this litigation.

Recently the Washington Supreme Court, in *Maytown Sand & Gravel, LLC v. Thurston County*, 191 Wn.2d 392, 438, 423 P.3d 223 (2018), *abrogated on other grounds*, *Yim v. City of Seattle*, 194 Wn.2d 682, 451 P.3d 694 (2019), limited the availability of an award of attorney fees for prelitigation bad faith, but the Court may have limited its ruling to "prelitigation, administrative fora attorney fees" intentionally caused by the tortfeasor. We distinguish *Maytown Sand & Gravel, LLC v. Thurston County* because the decision did not address a partnership setting, did not entail the refusal to honor clearly valid rights before litigation, and did not involve the discovery abuses conducted by Christopher Quinn and Christian Pang.

Preceding *Maytown Sand & Gravel, LLC v. Thurston County*, Division I of this court denied fees for prelitigation bad faith conduct in *Greenbank Beach & Boat Club, Inc. v. Bunney*, 168 Wn. App. 517, 280 P.3d 1133 (2012). We decline to follow *Greenbank Beach* because we disagree with its holding and reasoning. We are not bound by another Washington Court of Appeals decision. *In re Personal Restraint of Arnold*, 190 Wn.2d 136, 147-54, 410 P.3d 1133 (2018). In *Dalton M, LLC v. U.S. Bank*, __ Wn. App. 2d __, __ P.3d __ (2022), this division, Division III, recently disagreed with *Greenbank Beach & Boat Club, Inc. v. Bunney*.

### 3. Breach of Partnership Agreement

Because we affirm the superior court's award of reasonable attorney fees in favor of Johanna Grider on other grounds, we do not address whether the partnership agreement afforded Grider recovery.

### 4. Costs

Finally, appellants contend that the superior court awarded $23,000 in expenses unrecoverable under RCW 4.84.010. The appellants identify those expenses as expert witness fees, deposition transcripts, deposition travel costs, discovery master fees, and the costs of appearing by phone. But RCW 4.84.010 only addresses statutory costs when the law does not afford recovery for reasonable attorney fees. Therefore, the superior court did not err by awarding the expenses under RCW 49.48.030 and under equity.

### 5. Attorney Fees on Appeal

On the same grounds that the superior court awarded Johanna Grider reasonable attorney fees, she seeks an award of fees and costs on appeal. On the two bases that we affirm the superior court's ruling, we award Johanna Grider reasonable attorney fees and costs on appeal.

### CONCLUSION

We reverse the superior court's ruling that Johanna Grider is the controlling partner of the marijuana retail sales partnership. We remand to the court to determine whether to establish a receivership. The ruling granting Grider control of the partnership shall remain in effect until the earliest of (1) the superior court addressing the

52

appointment of a receiver, (2) the parties' court-approved agreement to a partnership control arrangement, (3) the superior court otherwise revokes its ruling, or (4) the date three months following issuance of the mandate. We affirm the superior court's award of damages, subject to a deduction for loan funds never forwarded to the partnership and recalculation of interest paid on the remaining sum. We also affirm the superior court's award of reasonable attorney fees and costs. Finally, we award Grider reasonable attorney fees and costs incurred on appeal.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Siddoway, A.C.J.

_____
Lawrence-Berrey, J.